<pre>
 1                UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF ALABAMA
 2


 3


 4   UNITED STATES OF AMERICA
                                    THURSDAY, APRIL 23, 2015
 5   v.
                                    CASE NO. CR14-00054
 6   ADRIANNE DAVIS MILLER,
                                    MOBILE, ALABAMA
 7         Defendant.
                                    COURTROOM 2B
 8   * * * * * * * * * * * * * *


 9


10


11                     SENTENCING
          BEFORE THE HONORABLE CALLIE V. S. GRANADE,
12               UNITED STATES DISTRICT JUDGE


13
     APPEARANCES:
14
     FOR THE GOVERNMENT:
15       GLORIA A. BEDWELL
         United States Attorney's Office
16       63 S. Royal Street, Suite 600
         Mobile, AL  36602
17       (251) 441-5845

18   FOR THE DEFENDANT:
         DOMINGO SOTO
19       Madden & Soto
         465 Dauphin Street
20       Mobile, AL  36602
         (251) 432-0380
21
     THE CLERK:  MARY ANN BOYLES
22   COURT SECURITY:  CSO CONNIE KING
     COURT REPORTER:  ROY ISBELL, CCR, RDR, CRR
23
           Proceedings recorded by OFFICIAL COURT REPORTER
24        Qualified pursuant to 28 U.S.C. 753(a) & Guide to
     Judiciary Policies and Procedures Vol. VI, Chapter III, D.2.
25          Transcript produced by computerized stenotype.
</pre>

EXAMINATION INDEX

CYNTHIA DAVIS
     DIRECT BY MR. SOTO . . . . . . . . . . . . . . . 12
     CROSS BY MS. BEDWELL  . . . . . . . . . . . . . . 14

MARGARET ANNE DAVIS
     DIRECT BY MR. SOTO . . . . . . . . . . . . . . . 15

JOHNNY R. DAVIS
     DIRECT BY MR. SOTO . . . . . . . . . . . . . . . 18
     CROSS BY MS. BEDWELL  . . . . . . . . . . . . . . 19

LARRY CARSON
     DIRECT BY MR. SOTO . . . . . . . . . . . . . . . 20
     CROSS BY MS. BEDWELL  . . . . . . . . . . . . . . 24

EXHIBIT INDEX

                                                 MAR ADM
DEFENDANT'S
  1     Factual resume                              10

  2     Letter from Ms. Miller to Mr. Pittman       10

1    (1:30 p.m., in open court, defendant present.)

2         THE CLERK:  Case set for sentencing in United States

3    of America versus Adrianne Davis Miller, criminal case number

4    14-54.  Is the government ready to proceed?

5         MS. BEDWELL:  Ready, Your Honor.

6         THE CLERK:  Is the defendant ready to proceed?

7         MR. SOTO:  Ready.

8         THE CLERK:  Ms. Miller, Mr. Soto, please come forward.

9         THE COURT:  All right.  Mr. Soto, have you and

10   Ms. Miller been over the presentence report?

11        MR. SOTO:  Yes, ma'am.

12        THE COURT:  All right.  And aside from your arguments

13   made in your latest file concerning a variance, what objections

14   do you have to the calculations?

15        MR. SOTO:  The gun enhancement.

16        THE COURT:  All right.  And what is the government's

17   position on that?

18        MS. BEDWELL:  Your Honor, I've spoken with Mr. Soto in

19   an effort to resolve the issue and he has indicated that he has

20   no factual objection to the evidence that is reflected in the

21   pretrial -- I'm sorry -- in the presentence investigation

22   report.  The government has photographs, Government's Exhibit

23   Number 1, of the firearm that was removed from the hotel room

24   that had been occupied by Thomas and Miller, this

25   defendant.  And then there were also three weapons recovered

from the coconspirators, the Markses.  We have photographs of
two of those, Government's Exhibits 2 and 3.  There was, as I
say, a third gun that was recovered from them, from their hotel
room when they were arrested.  But we didn't have a photograph
of that weapon that was easily accessible.  So the government
would offer these exhibits in the context of the facts that are
reflected in the presentence investigation report and rely on
the fact that guns are tools of the trade of drug traffickers
engaged in this activity at the level that was reflected in
this investigation.  And therefore the defendant is accountable
for them as a matter of law and also as supported by the facts.

THE COURT:  What is your argument, Mr. Soto?

MR. SOTO:  I'll leave it to the Court to decide what
the law is.  I don't think that's a proper characterization of
the law.  But at any rate, the backpack, if you will remember
the facts, the backpack -- there's no testimony that she ever
saw what was in the backpack.  In fact, Mr. Thomas was acting
very squirrelly and his behavior is partially what got them --
the surveillance teams running all over the county.  He had
apparently also in his backpack some contraband that he was
hiding and had taken it to the Weaver house where also there
were some guns, and I think it's been brought up in the context
of one of the other defendants.

As to the Markses, at the time that Ms. Miller got
arrested she started working with the officers and made some

1  telephone calls to Montgomery and was in complete confident --

2  not custody, but she was companioned for that whole 20 to 24

3  hours worth of time that it took the Markses to get to Mobile.

4  She never went in, she never went into the room, she never saw

5  the guns, and I don't think that there's enough to warrant a

6  two-point enhancement.

7          THE COURT:  Well, it's highly unlikely that she didn't

8  have some indication or knowledge, maybe not specific

9  knowledge, but some idea that guns are in fact a tool of the

10  trade and that the fact that a codefendant or codefendants

11  possessed these weapons, although without her specific

12  knowledge, I think that under the case law they are

13  attributable to her unless it was clearly improbable that the

14  weapons were not connected to the drug trade.

15          MR. SOTO:  Well, you'd have to -- she'd have to --

16  there's no testimony that anyone has ever seen her with a gun

17  or there's been any testimony --

18          THE COURT:  I don't think she has to possess it

19  herself.

20          MR. SOTO:  Okay.  I understand.  The backpack was

21  secreted from everyone, including her.  The backpack had

22  nothing to do with this drug transaction.  It had something to

23  do with the drug transaction he was committing with someone

24  else.  And as far as the Markses, no connection to that

25  either.  But other than -- other than --

1      THE COURT:  Well, no specific knowledge about that.

2      MR. SOTO:  Right.  Correct.

3      THE COURT:  But there is a connection of her drug

4  trafficking and the Markses' participation.

5      MR. SOTO:  Yes, ma'am.

6      THE COURT:  All right.  My finding is that it's an

7  appropriate enhancement.

8      But I'm happy to hear from you on whatever you want to

9  present on your variance argument.  Well, let me make my

10  finding first, though.  I find the total offense level is 40

11  with a criminal history category of II.  Are there further

12  objections to those findings?

13      MR. SOTO:  No, ma'am.

14      THE COURT:  All right.  Now I'll hear from you.

15      MR. SOTO:  Judge, I'm in this case way after -- I'm in

16  a position here where I've had to look at a lot of case law to

17  see if there was a reasonable argument to withdraw the plea,

18  what she understood.  I wouldn't -- what did Adrianne Miller

19  get for signing away her rights?  She's gotten nothing.  I

20  would never have signed a plea agreement with 5.3 kilograms in

21  addition to 180-something.  She is now looking at the

22  equivalent of a hundred tons of marijuana.  And her culpability

23  is far below everyone else.  And if you look at the other

24  worksheets and guidelines, she's looking at a lot more time

25  than even the Markses -- well, actually the Markses were

equivalent.  But anybody else, no.  And in fact in Mr. Marks
you lowered his from -- I think you lowered it to 200, if I'm
not mistaken.  And all she did was again not --

THE COURT:  Of course, he had the five years
consecutive after that.

MR. SOTO:  Yes, ma'am.  I understand.  But as far as
the punishment.  And the position that I find myself in, I have
gone over how this progressed, how she found herself in this
situation with the Court.  And some of the -- and I've
rejected -- I've looked at withdrawing the plea agreement.  And
I want to make sure this is on the record for maybe future
purposes.

THE COURT:  Right.

MR. SOTO:  But I've looked at the record, I looked at
the transcript, where Ms. Miller objected to the quantity.  And
the plea agreement, there was a different plea agreement put in
place.  I've spoken with her and she was at the time under the
impression, she says, from her lawyer that she was looking at
five years and then even from the guidelines that she was
looking at 10 years.  And that's still with the alternative of
a 5K, a very good -- very good proposition that she would get a
5K.  Because if you remember, on the day of her arrest she
immediately cooperated with the officers, she dragged the
Markses down here, she stayed with them on the stakeout the
whole time, she gave a debriefing shortly thereafter, she gave

another debriefing and, in fact, has recently given another debriefing, trying to expunge herself of the government's position that it won't give her a 5K.

And part of the government's position is that she was supposedly not available. And I have the parents here and some witnesses. At some point I'd like them to testify as far as the 3553. But I also wanted them to testify that Ms. Miller did stay in contact with the officers until about April, and then she was arrested in August, and then in September she signed a plea agreement. At the time that she signed the plea agreement, the government made the provision in there that she could get a 5K. So if they were not willing to give her the 5K, that seems disingenuous to me, especially since they represented to others that Ms. Miller was willing to testify against them.

And as you saw in my position paper, Ms. Colvin has said that it was because of her, Ms. Miller's, willingness to testify that Marks pled. Those are the kind of things.

At this point the government has taken the position that because she tested dirty, and because she has actually broken the conditions of her release, they are not going to give her the 5K. And I would ask you to mitigate her punishment because she's done everything. She was eight and a half, nine years clean. She's sick. She's a junkie. And she's going to be losing her points in acceptance of

responsibility.

Not only that, now she's looking at a drug quantity that far exceeds everyone else's -- and apparently what has happened is that quantity is coming from another district, not from this district. That's where that quantity of 5 point whatever kilograms is coming from.

If you look at the PSRs for everybody else, they're looking at 114 or 117 grams, those kind of quantities. And at that point if she was here before you she would easily be a candidate for five-year sentence or a six- or seven-year sentence. Instead, she's looking at 30 years. And just how much punishment is enough? 30 years sounds like -- and I think you used the word "draconian" in Mr. Marks' sentencing. That sounds really, really, really draconian when you're talking about in the grand scheme of these transactions and these operations, the go-between, the one that she's getting an eightball for this. She's not -- she's not getting the money. She's not getting -- she's not -- you know, she's a tagalong and at this point she's being punished way, way, way beyond anyone else.

In fact, in the footnote to my response, the lady that's called the biker lady, she was helping Jamie, they got a sentence that was well below 10 years.

I want to -- I want to for the record show you a couple of things back to the point about what Ms. Miller got

1  for her plea.  I have Defendant's Exhibit 1, which is the

2  factual resume part.  Did I give you that?  (Indicating.)

3        Which is the factual resume part of her plea

4  agreement.  And in that you'll see that when she was presented

5  with the plea agreement with the 5.3 kilograms, Ms. Miller

6  said:  "What's this about?" and crossed it out and put "224

7  grams," which is what she felt she was culpable.

8        And then I'd like to submit that for the Court's

9  consideration.

10        THE COURT:  All right.

11     (Defendant's Exhibit 1 was entered into evidence.)

12        MR. SOTO:  In addition, I have Defendant's Exhibit 2,

13  which I'd also like to move to admit, which is a letter between

14  Ms. Miller and Mr. Pittman where she says:  "I don't understand

15  the 108.72 grams on the last page.  I never cooked, I'm not

16  responsible for all that."  And she had communications with

17  Mr. Pittman objecting to the quantity.  I would move to offer

18  that, Judge, also for your consideration.

19     (Defendant's Exhibit 2 was entered into evidence.)

20        MR. SOTO:  And also just -- I don't think I have to

21  submit it, because it's already a court document, but I'd also

22  call your attention to page three of the plea agreement on

23  document 124.  And that's on the day of the plea.  There was

24  some issue as to the strikeout, because it had been stricken

25  out, and she said:  "I thought I was looking at five years to

40," and there was a big debate and you told them to go handle it. And within some certain amount of minutes, she came back and she signed it.

Now, the reason I did not move -- remove -- I did not move to remove the --

THE COURT: Withdraw the plea?

MR. SOTO: -- withdraw the plea agreement is that when it all comes down to it, she signed it and she went through the colloquy with you and I don't think that legally I could sit here and say that I want to withdraw something, and I thought that was a pyrrhic battle I don't want to get into. And it was my personal assessment and my judgment that that's a dead issue as far as that goes.

On the other hand, I do think that the Court should take that into consideration when you get to the 3553 elements, because this woman here has stayed clean eight and a half years, fell back into it partially. I mean, the responsibility is hers. But partially by being back with folks that do this stuff. And she ended up using and ended up falling back into this. And her use now has taken what was a bad but manageable sentence before but now into something that's pretty horrible.

And I want to take the opportunity, with the Court's indulgence, to call some witnesses.

THE COURT: All right. Y'all have a seat. Why don't you have a seat while he calls witnesses?

1      THE CLERK:  Miss, if you will step toward the witness

2  stand, I'll swear you in.  Raise your right hand.

3                    CYNTHIA DAVIS

4            was sworn and testified as follows:

5      THE WITNESS:  I do.

6      THE CLERK:  Thank you.  Please be seated.

7                  DIRECT EXAMINATION

8  BY MR. SOTO:

9  Q   Hi.  State your name, please.

10      MR. SOTO: Do you want me back there, Judge?

11      THE COURT:  You can stay here as long as everybody can

12  hear you.

13  BY MR. SOTO:

14  Q   Okay.  State your name, please.

15  A   Cynthia Davis.

16  Q   And, Ms. Davis, where do you live?

17  A   Montgomery.

18  Q   Okay.  And what's your connection to Adrianne?

19  A   I'm her mother.

20  Q   Okay.  And so can you explain to the Court a little bit

21  about Adrianne's condition as far as historically?  Obviously

22  she's sick.  How long has she been sick?

23  A   I think she started using drugs around 15.

24  Q   Okay.

25  A   She was not living with me at the time, so I'm not exactly

1  sure.

2  Q   Okay.  Well, you know about her psychological --

3  A   I do.

4  Q   Explain to the Court a little bit about that.

5  A   She's been diagnosed ADDHD and bipolar.

6  Q   And does that have any impact on her drug use?

7  A   I think -- and I'm not a doctor -- but just self-

8  medicating, is all I can think.

9  Q   Okay.  And I got confused.  Are there two Ms. Davises?

10  A   Yes.

11  Q   Okay.  So all right.  Do you want to --

12         THE COURT:  You are her biological mother?

13         THE WITNESS:  Mother, yes, ma'am.

14  MR. SOTO:

15  Q   Okay.  So is there anything you want to tell the Court as

16  far as sentencing?

17  A   Adrianne's got a good heart and she means well.  She just

18  needs medical help.  I truly believe that.  (Crying.)

19  Q   Okay.

20  A   And I don't think prison is a place for her to find it.  I

21  think she needs extensive rehab.  She's fought this for a long

22  time.  And she doesn't like doing it.  But she -- she just

23  can't help it.

24  Q   Okay.  Well, you know something about her -- her

25  psychological problems as far as -- did you know her husband?

1    A   Yes, I did.

2    Q   Okay.  And do you know that she's had some problems as far

3    as that goes?

4    A   Oh, yes, sir.  I didn't know until after the fact, but it

5    was a very violent relationship and he was physically --

6    physically violent to her and mentally as well, emotionally

7    too.  I went down there one time.  She was going to have to

8    have some surgery.  And he was just -- just cold.  I mean, it's

9    like he didn't care.

10   Q   But as far as -- as far as that having an impact on drug

11   use, is that a reason or excuse or is that why she gets into

12   drug use?

13   A   I don't know if that was the cause of it or not.  But I

14   think emotionally it had an impact on her in a negative way, I

15   certainly do.

16           MR. SOTO:  Okay.  Answer this lady's questions.

17           THE COURT:  Ms. Bedwell, do you have any questions?

18                       CROSS EXAMINATION

19   BY MS. BEDWELL:

20   Q   You said that she did not live with you; is that right?

21   A   She lived with me until she was about -- oh, I would say 12

22   or 13, something of that nature.

23   Q   And then where did she go?

24   A   She went to live with her dad and stepmother.

25   Q   And was that a court-ordered living arrangement?

1   A    No, ma'am.

2   Q    She chose to live with them?

3   A    Uh, it was a decision we all made mutually.

4   Q    And then you said, I think, that she does not like using

5   drugs, but she can't help it?

6   A    That's just my assumption.  I'm not a doctor.

7        MS. BEDWELL:  That's all.

8        THE COURT:  All right.  You may step down, ma'am.

9   Thank you.

10       MR. SOTO:  Ms. Davis, the other Ms. Davis.

11                    MARGARET ANNE DAVIS

12            was sworn and testified as follows:

13       THE WITNESS:  I do.

14       THE CLERK:  Thank you, ma'am.  Please be seated.

15                    DIRECT EXAMINATION

16  BY MR. SOTO:

17  Q    State your name, please.

18  A    Margaret Anne Davis.

19  Q    And where do you live?

20  A    Montgomery.

21  Q    And what's your relationship to Adrianne?

22  A    Her stepmother.

23  Q    Okay.  How long have you known her?

24  A    Since she was about 12.

25  Q    So she's been living with you since she was 12?  She

1  started living with you when she was 12?

2  A   Yes, sir.

3  Q   And can you describe for the Court her psychological and

4  physical condition?

5  A   Adrianne was a lovely child.  And she, I think, just had

6  some emotional issues that she let get the best of her.  And I

7  guess she has had trouble controlling that.  She's not a bad

8  person, like her mother said.  She's a wonderful person.  And

9  she has wonderful support from her entire family -- aunts,

10 uncles, cousins, grandparents that are left.

11 Q   But at some point she started using drugs; when was that?

12 A   She did.  I would have to agree with her mother it was

13 probably about 15-16.

14 Q   And did she -- has she been in treatment for it?

15 A   She has been in treatment.

16 Q   Okay.  And where, how much, how long?  Do you know?

17 A   She's been in at least three to four programs.

18 Q   For --

19 A   Most of them are like 90 days.

20 Q   For what addiction?

21 A   Drug addiction.

22 Q   General drug addiction?

23 A   General position, yes.

24 Q   Taking anything she can get?

25 A   Yes, sir.

1  Q   And do you know anything about her psychological profile?

2  A   That was between her mother and her father.

3  Q   Let me show you what's been marked as Defendant's Exhibit

4  3, ask you if you recognize those.

5  A   I do.

6  Q   And what else -- what is that?

7  A   These are Gmails that Adrianne instructed me to pull from

8  her Gmail account and forward to you.

9  Q   Okay.  And -- and those you took off the internet?

10 A   Yes, sir.

11       MR. SOTO:  Okay.  Judge, these were previously

12 submitted to the Court under seal.  And I've given her --

13       THE COURT:  Yes, I've read those.

14       MR. SOTO:  Okay.  At any rate, that's all I

15 have.  Thank you.

16       THE WITNESS:  Okay.  I would like to say that I think

17 that -- or I wish that the Court would really feel or look at

18 helping people that are having trouble with drug addiction, and

19 obviously she has a bad problem with drug addiction, and that I

20 don't understand or feel like jail time is the cure for an

21 addiction like she has.  And I really wish there was a program

22 or something that could help, you know, not incarcerate with

23 her addiction and her problems.  And she knows we love her very

24 much.

25       THE COURT:  Thank you.

1          MS. BEDWELL:  I don't have any questions.

2          MR. SOTO:  Mr. Davis?  (Indicating.)

3          THE CLERK:  Mr. Davis, let me get you to raise your

4    right hand.

5                    JOHNNY R. DAVIS

6               was sworn and testified as follows:

7          THE WITNESS:  I do.

8          THE CLERK:  Thank you.  Please be seated.

9          MR. SOTO:  Since the Court has actually read these,

10   I'm not going to go too deeply into them.  And I'd just point

11   out later at argument some of the things.  Okay?

12         THE COURT:  Sure.

13                   DIRECT EXAMINATION

14   BY MR. SOTO:

15   Q   State your name, please.

16   A   Johnny Davis.

17   Q   Okay.  And, Mr. Davis, obviously Adrianne is your daughter?

18   A   Yes.

19   Q   Is there anything you'd like to say to the Court as to how

20   you feel about her sentencing?

21   A   Well, I mean, we know that she's got a problem.  We're

22   asking the Court to have mercy.  I think when she did a 12 --

23   she did a 12 -- it was between a 12- and 14-month program, she

24   stayed clean for nine years.  The two- and three-month programs

25   didn't seem to do whatever.

1    She is, like her mother said, she is, she's been

2    diagnosed with the -- what was it?  I don't even -- I'm sorry.

3  Q   Bipolar?  Bipolar?

4  A   Bipolar, yes.  And ADHD as a child.  We didn't actually --

5  we didn't believe in giving her the drugs that they give the

6  ADHD children, so we -- but the bipolar drugs, I think there

7  was a short time that she used, took those.  And, you know, I

8  mean, I'm just -- all can I say is I want to see my child.

9  So --

10          THE COURT:  All right.  Thank you.

11          MR. SOTO:  Thank you.

12          MS. BEDWELL:  Wait.  I have a few.

13          THE COURT:  All right.  Do you have any questions,

14  Ms. Bedwell?

15                   CROSS EXAMINATION

16  BY MS. BEDWELL:

17  Q   Did you have any phone conversations with Deputy Sullivan?

18  A   Ma'am, so much was going on, I think I did have a phone

19  conversation with him.

20  Q   And do you recall telling him that she was off the wagon?

21  A   Probably.  If she was doing drugs, yes.  I know my child, I

22  know my daughter, because I know when she's either with me or

23  she's my child or she's the drug child, I mean.  So I probably

24  did, yes, ma'am.

25  Q   And was she subjected to any form of drug testing during

1  the time that she claims that she was clean?

2  A  She actually did, yes.  She was on probation for a while

3  and then also she worked for a couple of companies that they're

4  in the trucking business and, yes, she did have the drug test

5  occasionally, yes, ma'am.

6  Q  And do you know when that was?

7  A  Ma'am, oh, no, ma'am, I can't recall.

8  Q  No specific information?  And I take it that the

9  information you have about that came from the defendant

10  herself?

11  A  Well, I think so.  You know, ma'am, it's been a while.  I'm

12  not trying to be evasive or anything, but I can't really recall

13  that.

14        MS. BEDWELL:  That's all.

15        THE COURT:  Thank you, sir.  You may step down.

16        THE WITNESS:  Thank you, ma'am.

17        THE CLERK:  Sir, if you will step forward toward the

18  witness stand here, I'll get you to raise your right hand.

19                    LARRY CARSON

20              was sworn and testified as follows:

21        THE WITNESS:  I do.

22        THE COURT:  Thank you, sir.  Please be seated.

23                  DIRECT EXAMINATION

24  BY MR. SOTO:

25  Q  Yes, sir.  Lean up to the mic and tell me your name.

1    A    Larry Carson.

2    Q    Okay.  And, Mr. Carson, what's your profession?

3    A    I'm a Baptist minister.  I'm bivocational, I also

4    work.  I'm an owner-operator with a trucking company.  I run

5    Hot Shot Deliveries.

6    Q    High Shy?

7    A    Hot Shot Deliveries.

8    Q    So how do you know Adrianne Miller?

9    A    She was the dispatcher at Quick Delivery.

10   Q    Okay.  And how long did you know her?

11   A    Two years maybe.  Were you there two years, Adrianne?

12   Q    Don't, don't ask.

13   A    I'm sorry.

14         THE COURT:  Close enough.

15   A    I don't recall the time exactly.

16   MR. SOTO:

17   Q    About two or three years?

18   A    Yes, something like that.

19   Q    And how would you characterize her work ethic?

20   A    She was very good.  I thought we had a very good work

21   relationship.  Some of the places that we went, my wife had

22   family or I had family and if she knew about it she would

23   dispatch us on a trip that was going there.  If she needed work

24   done she could count on, she'd call me.  And I thought we

25   had -- I thought we were more than just employer-employee or

1    whatever.  I thought we were friends.

2    Q    Is there anything you'd like to say to the Court as far as

3    fashioning a sentence for Ms. Miller?

4    A    I wrote a letter to the judge.

5         THE COURT:  And I read it.

6    A    And in the letter I did not make any attempt to deny guilt,

7    but I did ask for mercy.  And I believe that every person being

8    a creator -- or creation of God deserves every opportunity.

9    And I know that God is a merciful God.  And if he was not, none

10   of us would be here.  I believe that Adrianne Miller is a good

11   person and I believe she deserves a chance.

12        And Adrianne herself told me on a visit at the Home of

13   Grace that Judge Granade had said she was going to give her

14   another chance and send her out there rather than sending her

15   to prison back then.  My argument to the Judge was that I

16   believe she had learned her lesson because she owned her

17   mistake, she said:  "I did it.  I'm guilty.  I've done this to

18   myself."

19        And to me that's virtually a confession and

20   repentance.  It's an acknowledgment.  And my Bible tells me if

21   we'll confess our sins, God's faithful and just to forgive us

22   our sins.

23        And that's the basis of my request for mercy.  I

24   believe she has a good heart and she deserves another

25   opportunity.  And I join her stepmother in saying there should

1    be and probably is somewhere some kind of help for people like

2    Adrianne.  And I think it's not only a medical but also a

3    spiritual thing as well.  And I make a plea again for mercy.

4    Q   But obviously you don't know anything about her drug use;

5    right?

6    A   I knew -- I believe that she told my wife.  My wife goes

7    with me on the Hot Shots.  And Adrianne had talked with my wife

8    and I believe she told her that she had had problems with drugs

9    and perhaps had been incarcerated.  I don't recall for

10   sure.  But my understanding was she had paid her dues.  And I

11   never brought it up, never had any occasion to doubt her

12   character the time that I was working with her.  And I knew

13   that she had had some problems.  I did not know the depths or

14   the details, but I did know.  But then I think we all have had

15   problems in our life.

16   Q   So if the PSR says she worked for you from October 19th of

17   2009 to February 16th, 2012, is that correct?

18   A   That's probably about right, yes, sir.

19   Q   So is that at the point when she was married to -- or was

20   that after?

21   A   She was married to Mike Miller, I believe.  Was it Mike?  I

22   believe Mike Miller.

23   Q   Was that during that time?

24   A   Yes, yes.

25         MR. SOTO:  Thank you.

1          THE COURT:  Ms. Bedwell, do you have any questions?

2                       CROSS EXAMINATION

3   BY MS. BEDWELL:

4   Q   You said that you knew that she had previous felony

5   convictions for drugs; is that right?  Or did you know that?

6   A   I knew that she had had problems with drugs, and it seems

7   that I do recall that she had said she had been incarcerated or

8   maybe in some program.  I do not know exactly the details.  I

9   did know that she had had problems with drugs.

10  Q   Was she subject to drug testing while she worked for you?

11  A   Yes, sir [sic].  The company has a random drug testing

12  program.

13  Q   Did she submit samples?

14  A   I do not know about that.  I only know that I did two or

15  three times.

16          MS. BEDWELL:  That's all.

17          MR. SOTO:  That's all.

18          THE COURT:  All right.  Thank you, sir.  You may step

19  down.

20          MR. SOTO:  That's all I have, Judge.

21          THE COURT:  All right.  Ms. Miller, will you step back

22  up here, please?

23          Mr. Soto, do you have anything else you'd like to say

24  before I ask Ms. Miller if she'd like to speak?

25          MR. SOTO:  No, Judge, other than in looking at my

response to the PSR, in footnote six I think I misquoted the amounts that the other defendants were being held accountable for, 172 grams, Strickland and Thomas, to 88.5 and 172 grams. So that's what the people involved in this conspiracy -- and with actually much more culpability than she has -- were held accountable for.

I can't speak to how we got here other than to say that in fashioning a sentence I'd ask you to consider that the guidelines way overstate her culpability and ask you to fashion a sentence that's fair.

30 years, even 20 years, sounds like smashing a gnat with a sledgehammer. I mean, that's fairly -- it's not fairly -- it's overly, it's overly, overly punitive. And I'd ask you to fashion something that's -- I'd ask you for 10. I think that's twice what she thought she was going to get at the beginning of all this. But on the other hand, no one told her to do -- making excuses for her, we understand making excuses for her. But at some point -- and I think she would be willing to tell you: "I'm responsible for what I've done."

On the other hand, she has lost her points for acceptance of responsibility and I'd ask you to fashion a sentence that's much more commensurate with the level of her culpability.

THE COURT: All right. Ms. Miller, do you have anything that you'd like to say?

1          THE DEFENDANT:  Yes, ma'am.  Can I read my statement?

2          THE COURT:  Yes, you can read it.

3          THE DEFENDANT:  Okay.

4      (A discussion was held off the record between the defendant

5  and her attorney.)

6          MR. SOTO:  You need to speak up so I can understand

7  you.

8      (A discussion was held off the record between the defendant

9  and her attorney.)

10          MR. SOTO:  You can tell her, you can tell her all

11  that.

12          THE DEFENDANT:  Your Honorable, Honorable Judge

13  Granade.  I'm sorry, I'm sorry.  I humbly stand before you

14  today genuinely expressing the depth of my sincerest apologies

15  to you, your courtroom, the judicial system, all the

16  authorities and the people that work in it, my family, my

17  friends, and anyone else that my poor decisions have affected

18  as a direct result of my drug addiction.

19          Unfortunately I've struggled with drug addiction since

20  a young teenager after the extremely emotional divorce of my

21  parents at a critical age, which -- I'm sorry --

22          MR. SOTO:  Calm down.

23          THE DEFENDANT:  -- I'm trying -- which led to

24  emotional behavior problems and poor decision-making skills.

25  At a young age I was clinically diagnosed with bipolar manic

1    depression and placed on medication which seemed to stabilize
2    the chemical imbalance.
3          Growing up I experienced sexual abuses, feelings of
4    worthlessness, hopelessness, resentment, fear, depression,
5    anxiety, negative influences, rejection, confusion, and all the
6    feelings that young people go through that cause them to run
7    and self-medicate.
8          Fortunately, I've been blessed with a loving family --
9    my mom, my dad, my stepmother, aunts, uncles, grandparents,
10   cousins -- that have never given up on me or lost hope.  They
11   loved me when I didn't know how to love myself.
12         11 years ago I experienced a judicial intervention
13   which saved my life.  I was court ordered to enter a 90-day
14   treatment -- in-patient treatment center for women, Second
15   Choice, here in Mobile, where I ended up successfully
16   completing the program.
17         After one year they kept me there.  They provided
18   mental health services which enabled me to get the proper help
19   that I needed, start my medication again, and I remained clean
20   and quickly became a productive member of society for nine --
21   I'm sorry -- for nine years here in Mobile.  I was extremely
22   active in Narcotics Anonymous and other outreach programs and
23   worked my way up in the field of logistics in which I became
24   extremely successful and a huge asset to the industry here on
25   the Gulf Coast.

1        In those nine years I got married, became a stepmom
2  and had a family.  Four years into my marriage I endured
3  emotional, mental, and physical abuse which led to a very
4  emotional divorce, in which I slowly started self-medicating,
5  ended up in a full-blown relapse with crystal meth, only this
6  time using the drug intravenously, which I had never done
7  before.
8        In less than one year I lost everything I had worked
9  so hard for, including -- I'm sorry -- including my dignity,
10 integrity, ambition, and managed to successfully get mixed up
11 with a completely wrong crowd, which I now deeply regret and am
12 very sorry for.
13       Again, this judicial intervention has saved my
14 life.  I begged the authorities in this case for help before I
15 was arrested.  After getting incarcerated, I was blessed to be
16 able to go to the Home of Grace and try something I'd never
17 tried before, which is accepting Jesus Christ as my Lord and
18 Savior.
19       At this time I was also led to a man who has never had
20 any judicial interventions and never done a drug a day in his
21 life of 42 years.  He loves the Lord with all his heart and
22 sole.  His name is Lonnie Campbell, and is now my fiance.  And
23 I have been so blessed to have him, his children, and his
24 family, which are here today, in my life, to love me, believe
25 in me, and not give up on me.  God has placed a burning desire

in my heart to become a mom, which I've never had the chance to
be.  I absolutely love life.  I love my family.  I'm a huge
family person, I'm a people person.  I love to make people
smile.

Your Honor, I'm not denying my involvement and I'm
fully aware that there are consequences to pay for my actions
and my poor decisions of being an addict, a hopeless addict.
And I'm asking and begging and pleading for mercy, that you
would consider sentencing me to a long-term drug rehabilitation
facility instead of a prison term.  I don't care how long it
takes.  I'll go.  I know in my heart -- I know in my heart that
drug rehabilitation is more conducive to my drug and mental
issue than prison.  My ultimate goal and dream is to use my
experience, strength, and hope to give addicts like me a chance
to get the help that they need instead of being another
statistic and expense to the federal prison system.

I hope and pray that you can find it in your heart to
consider treatment options for my future other than
imprisonment.  I thank you with all my heart and soul for
taking your time to listen to me.

THE COURT:  All right.  Does the government have a
position?

MS. BEDWELL:  Your Honor, we do have a position.  And
I want to just briefly address the emails that Mr. Soto has
referred to which reflected that during the time frame that

1  those exchanges occurred the deputy was on annual leave and was

2  simply not in town or available to reply.  Our understanding of

3  that exchange was that the deputy did speak with the

4  defendant's father when he was attempting to locate her, the

5  defendant's father did inform the deputy that she was off the

6  wagon, off the reservation, and she was simply not available

7  after that time for the purposes that were required as a result

8  of her agreement to cooperate.

9         It strikes the government that this defendant has

10  consistently sought to shift responsibility for her criminal

11  activities to others.  She always seems to have a reason why

12  she has not been successful.  From one point to another it was

13  because of a divorce, it was because of a bad relationship.

14         At this point in her life the government submits that

15  the defendant is here before the Court because of her decision

16  to commit crimes, not because she is a drug addict, but because

17  she participated as a drug distributor of substantial

18  quantities of methamphetamine ice over a period of time.  And

19  if she as a drug addict has such a serious -- or takes offense

20  to the use of controlled substances, this methamphetamine ice

21  in particular, how is she not accountable for the hundreds of

22  users of that substance in this community only because of her?

23  It's because of her that that drug was distributed to people

24  who are addicts in this community.  Not because she was a drug

25  user, but because she was a drug distributor and operated at a

1   very high level.  These weren't eightballs.  They were multiple

2   ounces, kilograms of methamphetamine ice distributed to hapless

3   addicts in this community because of her.

4        And the government submits that that is one of the

5   reasons why Congress has required penalties not for addicts,

6   but for criminals who break that law.  And the punishment is

7   indeed appropriate to fit the crime -- particularly under the

8   circumstances we see here, where there are firearms involved.

9   And again the defendant is accountable under the current state

10  of the law.

11       So the government submits, with that having been said,

12  that the guidelines do provide a reasonable sentence and we do

13  recommend that the Court sentence her within the guideline

14  range.

15       Although the defendant has clearly breached the plea

16  agreement, the government submits it is not bound at this time

17  -- as a result, again, of the defendant's own actions -- but we

18  submit that that would produce a reasonable sentence, given the

19  statutory factors which require the Court to consider the

20  impact of this defendant's criminal activities on others in the

21  community as well as the seriousness of this offense.

22       THE COURT:  Ms. Bedwell, can you tell me how the 5.3

23  kilograms of methamphetamine ice were arrived at in this

24  particular --

25       MS. BEDWELL:  I could if I had my notes.  But I don't

have the notes with me.  But I'm sure we computed that based on

the historical information provided by the defendant and others

who were involved in this investigation.

THE COURT:  Well, I guess Mr. Soto had indicated that

a great majority of that amount came from another district, and

I guess he's speaking of Montgomery.

MR. SOTO:  Yes, ma'am.

THE COURT:  The Middle District.  But that was where

the Markses were distributing from for the most part, was it

not?

MS. BEDWELL:  Your Honor, we -- I don't believe that

anyone in this investigation has seen documents relating to the

case in Montgomery.  I know that some of the defendants were

indicted.

THE COURT:  There was a case in Montgomery?  I'm not

aware of a case in Montgomery.

MS. BEDWELL:  There was an indictment in Montgomery

against Marks.

THE COURT:  But not -- was it related to what they

pled to here?

MS. BEDWELL:  I'm not certain of that, Your Honor.

MR. SOTO:  (Nodding head affirmatively.)

MS. BEDWELL:  It appears that it's a methamphetamine

case, and I was aware that he was under investigation there and

ultimately they chose to indict him.  So I know that there was

1  an investigation in Montgomery that resulted in Marks' -- a

2  separate indictment against him.  But we have not participated

3  really in that investigation beyond just knowing that there was

4  one.  So I don't believe that any of the numbers came from

5  anything that had to do with Montgomery.

6         My recollection, without looking at the notes, is that

7  it was based on historical information provided by this

8  defendant and Strickland and corroborated by hotel and business

9  records and telephone tolls.

10        THE COURT:  All right.  And tell me, if you can, what

11  was the hierarchy in terms of the defendants that were indicted

12  in this case and that have been found guilty.

13        MS. BEDWELL:  Clearly the Markses had access to the

14  source of supply and this defendant was directly involved with

15  the Markses.  And so she would be at a level slightly below

16  Jeffrey Marks only because she was -- the amounts of

17  methamphetamine she got from him were eight and nine ounces at

18  a time.

19        THE COURT:  And what about Strickland?

20        MS. BEDWELL:  Strickland was one step lower, one step

21  removed, because he did not have direct contact with the

22  Markses.

23        MR. SOTO:  Be quiet.

24        THE DEFENDANT:  Okay.  Sorry.

25        THE COURT:  All right.  Do you have anything you want

1   to say?

2          MR. SOTO:  That is so infuriating, Judge.  It's -- you

3   have Strickland and you have Marks and you actually have some

4   others involved in this.  This hapless addict, as she

5   characterizes everyone else -- now she's not a hapless addict,

6   now she's the linchpin.

7          She's not trying to get away with being responsible

8   for what she's done.  But she's -- and I think the Court's in

9   the right direction here -- trying to put her -- yes, she's the

10  hookup, as they say, because she knows somebody in Montgomery.

11  She knows somebody in Montgomery because she's from Montgomery

12  and she hooks these guys up.  She's getting an eightball for

13  this.

14         THE COURT:  That's what she's getting.  But isn't she

15  also distributing?

16         MR. SOTO:  No.

17         THE COURT:  What do you mean, no?  That's what she

18  pled to.

19         MR. SOTO:  Well, she's guilty of being in the

20  conspiracy.  I understand that she is guilty of this

21  conspiracy.  But putting her in the context as number two is

22  very disingenuous because number two is Strickland.  And if you

23  see what Strickland pled to, he either pled to 88.5 or 172.2,

24  I'm not sure which one that is.  I'm imagining the higher

25  quantity.  But that's really what we should be talking about,

1  not 5.3 kilograms.

2          Unfortunately, she signed a plea agreement with that

3  number on there.  And I'm asking you to put it in the context

4  of what she actually did.  And I think that your question is

5  very, very, very cogent.  Yes, she's an integral part of this

6  because she knows somebody from Montgomery.  She's not trying

7  to deny that.  On the other hand, saying that she's number two

8  is completely ridiculous.  Number two is Strickland.  And if

9  you put it in that context and if you're trying to gauge the

10  culpability, then she's below Strickland.

11          And he's pled to 172 grams.  Why?  And the other --

12  the idea that this quantity doesn't have anything to do with

13  Montgomery is also infuriating because what she's done -- what

14  Ms. Miller did was immediately told them about this gentleman

15  named Battles, who was a major distributor and Marks' source of

16  supply in Montgomery, and she told them, all the agents, all

17  about this guy.  And I think Agent Murphy would say that's

18  true.  Is that true?

19          AGENT MURPHY:  Yes, she has told us about that.

20          MR. SOTO:  She's told them all that stuff.  And then

21  she puts it on Marks, they get Marks, he cuts a deal, he tells

22  them about these quantities, and now she's backed into this

23  quantity.

24          MS. BEDWELL:  Your Honor, if I may, paragraph 14 of

25  the report reflects that the defendant told the agents that

Marks supplied eight to nine ounces of meth every week for six months. And that's what she was involved with Marks over that time frame. She was aware of it, she was involved in it, and she's accountable for it.

THE COURT: Well, I don't have any doubt that she's accountable for whatever the Markses brought here. Because she was the hookup, as you said. So, I mean, I'm not doubting the amounts. What I'm trying to determine is what her part in it was. And the recitation of facts in the presentence report starts out with Strickland saying that he would be getting his drugs from Miller.

MR. SOTO: I understand. And I objected to that in my response. That's to something Strickland was telling the agents. And where's Strickland, if we need to postpone this to get Strickland in here? But Strickland's -- Strickland's characterization to J. T. Sullivan is trying to get them away from him. And we contest that that's accurate. We put that in my response. Strickland is the money guy. Marks is the dope guy. She's the person that knows them both.

THE COURT: She's the facilitator.

MR. SOTO: Exactly. She's the linchpin. No one's trying to get away with anything, Judge. What we're trying to do is put it in the proper perspective. And this 360 or even 20 years is like way so over the top for this particular crime. I would hope you would agree with that.

1      THE COURT:  Well, let me ask Ms. Bedwell what is it
2  about Ms. Miller's situation that justifies her getting a
3  sentence in excess of what Marks got?
4      MS. BEDWELL:  Well, that's the way the guidelines ran
5  out in this case.  And we --
6      THE COURT:  I mean, we're talking about the same
7  amount of --
8      MS. BEDWELL:  Well, for various reasons, we had to
9  engage in differing negotiations with some of the
10  codefendants.  A portion of that time was when the defendant
11  was on the lam and we did not know whether we could rely on
12  her.  We did not know how -- it appears to the government that
13  her credibility is substantially damaged and that she would not
14  have made a credible witness.  So the negotiated amounts were
15  based on different factors in different cases.
16      THE COURT:  All right.  Well, these cases are never
17  easy, especially when we're talking about such astronomical
18  sentences for drug dealing.  But the fact is that you were
19  involved in dealing substantial amounts of methamphetamine for
20  some period.
21      However, I don't know that the guideline range is
22  appropriate in this case because it is very high.  360 months
23  to life.  However, there is a statutory mandatory minimum here
24  as well that we're dealing with.  And based upon the whole
25  situation, as far as I can understand it at this point, I think

a sentence at the 180-month range is an appropriate sentence in
your case.  Now, that's about half of what the guidelines call
for in this case.

MR. SOTO:  Yes, ma'am.

THE COURT:  It's still a long sentence.  It's a 15
years sentence.

I'm now going to state the sentence I intend to impose
and after I've stated it I will allow counsel to make legal
objections before the imposition of the sentence.

Pursuant to the Sentencing Reform Act of 1984, it is
the judgment of the Court that the defendant, Adrianne Davis
Miller, is hereby committed to the custody of the United States
Bureau of Prisons to be imprisoned for a term of 180
months.  This term consists of 180 months as to count one and
180 months as to count five, both terms to be served
concurrently.

I do recommend that you be imprisoned at an
institution where a residential comprehensive substance-abuse
treatment program is available as well as an institution where
psychiatric or psychological help is available.

Upon release from imprisonment, the defendant shall be
placed on supervised release for a term of five years on count
one and three years on count five, both terms to run
concurrently.

Within 72 hours of release from custody of the Bureau

1    of Prisons, the defendant shall report in person to the

2    probation office in the district to which she is released.

3    While on supervised release the defendant shall not commit any

4    federal, state, or local crimes.  She shall be prohibited from

5    possessing a firearm or other dangerous device and shall not

6    possess a controlled substance.

7             In addition, the defendant shall comply with the

8    standard conditions of supervised release as recommended by the

9    United States Sentencing Commission and that are on record with

10   this Court.

11            The Court orders that the defendant also comply with

12   the following special conditions of supervised release:  First,

13   she shall participate -- or she shall submit to periodic urine

14   surveillance and/or breath, saliva, and skin tests for the

15   detection of drug abuse, as directed by the probation office.

16   The defendant may incur the costs associated with such

17   detection efforts based upon her ability to pay, as determined

18   by the probation office.

19            Second, the defendant shall participate in an

20   assessment or a program, in-patient or outpatient, for the

21   treatment of drug and/or alcohol addiction, dependency, or

22   abuse as instructed and as deemed necessary by the probation

23   office.  And, again, the defendant may incur costs associated

24   with such treatment based upon the ability to pay as determined

25   by the probation office.

Third, the defendant shall participate in a mental health evaluation and comply with any treatment consistent with the findings of said evaluation.

The defendant shall also commit her person, house, residence, vehicles, papers, computers, or other electronic communication or data storage devices at her business or place of employment and residence and any other property under the defendant's control to a search conducted by the probation office at a reasonable time and in a reasonable manner based upon reason and suspicion of contraband or evidence of violation of conditions of release.  Failure to submit to search in accordance with this condition may be grounds for a revocation.  And the defendant shall warn any other occupants at her place of residence and/or business that the premises may be subject to searches pursuant to this condition.

And the Court finds that the defendant does not have the ability to pay a fine.  Therefore, a fine is not imposed.

The Court finds that the advisory guideline range is not appropriate to the facts and circumstances of this case in that the sentence imposed provides for a reasonable sentence, given the statutory purposes of sentencing.

This is a variance sentence.

The sentence imposed addresses the seriousness of the offense and the sentencing objectives of punishment, deterrence, and incapacitation.

It is ordered that the defendant pay a special assessment in the amount of $100 on counts one and five, for a total of $200, which shall be due immediately.

Now, having stated the sentence I intend to impose, are there legal objections to it?

MS. BEDWELL:  No objections, Your Honor.

MR. SOTO:  No, ma'am.

THE COURT:  All right.  I hereby impose the sentence as stated.

Now, Ms. Miller, you can appeal your conviction if you believe your guilty plea was unlawful or involuntary or if there's some other fundamental defect in the proceeding that was not waived by your guilty plea.  You also have a statutory right to appeal the sentence itself in certain circumstances, although you entered into a plea agreement which waives certain of those rights.  If you do decide to appeal, you must do so within 14 days of entry of judgment in this case and Mr. Soto could file that notice for you.

I believe count four is due to be dismissed; is that correct?

MS. BEDWELL:  So moved, Your Honor.

THE COURT:  All right.  It is hereby dismissed. Anything further?

(A discussion was held off the record between the defendant and her attorney.)

1          THE COURT:  Mr. Soto, is there anything further?

2          MR. SOTO:  No, ma'am.

3          THE COURT:  The government?

4          MS. BEDWELL:  That's all, Judge.

5          THE COURT:  All right.  We're adjourned.

6       (This hearing concluded at approximately 2:29 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T E

STATE OF ALABAMA)

COUNTY OF BALDWIN)


I do hereby certify that the foregoing proceedings were taken down by me and transcribed using computer-aided transcription and that the foregoing is a true and correct transcript of said proceedings.

I further certify that I am neither of counsel nor of kin to any of the parties, nor am I in anywise interested in the result of said cause.

I further certify that I am duly licensed by the Alabama Board of Court Reporting as a Certified Court Reporter as evidenced by the ACCR number following my name found below.


_____  8/17/2015
ROY ISBELL, CCR, RDR, RMR, RPR, CRR
ACCR #22
COURT REPORTER, NOTARY PUBLIC
STATE OF ALABAMA AT LARGE

My Commission Expires: 10/7/2017

Certified Court Reporter
    Alabama Board of Court Reporters
Registered Professional Reporter
Registered Merit Reporter
Registered Diplomate Reporter
Certified Realtime Reporter
    National Court Reporters Association

*Roy Isbell, CCR, RDR, CRR, Official Court Reporter*
*113 St. Joseph Street, #231, Mobile, Alabama 36602*