## IN THE UNITED STATES DISTRICT COURT
## FOR   THE
## SOUTHERN DISTRICT OF ALABAMA

---

ADRIANNE MILLER

     Petitioner,

  vs.                       CASE NO: 1:14-CR-00054-004-CG

UNITED STATES OF AMERICA

     Respondent.

---

FILED AUG 31 '20 PM 2:15 USDC-ALS

---

## MOTION PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i) REQUESTING THE COURT REDUCE THE SENTENCE OF ADRIANNE MILLER FOR EXTRAORDINARY AND COMPELLING REASONS IN LIGHT OF THE FIRST STEP ACT.

---

Petitioner Adrianne Miller hereby moves this Court pro-se for an order granting a reduction in sentence for extraordinary and compelling reasons as outlined below.

## CASE HISTORY

Ms. Miller was arrested and charged with various drug offenses. She was charged with violating 18 U.S.C. § 846, 841. Specifically, she was charged with Conspiracy to Possess with Intent to Distribute Methamphetamine, and Possession

1

of List I chemical with knowledge and reasonable cause to believe it would be used to manufacture a controlled substance. The Court subsequently imposed a term of 15 years imprisonment.

## ARGUMENT

Adrianne Miller understands that she committed serious offenses and deserved a harsh punishment for that conduct. She regrets the irrational and irresponsible decisions that she made to engage in drug trafficking. This request for a reduction in sentence in no way seeks to undermine the seriousness of the offense. Here, Ms. Miller is asking for this Court's mercy, grace, and compassion.

This is a case that presents extraordinary and compelling reasons that militate for a reduction in sentence to time served. The first extraordinary and compelling reason in this case concerns the fact that Ms. Miller has tested positive for COVID-19. Miller is currently housed at the woman's prison in Coleman Florida at FCC Coleman. Miller has tested positive for COVID-19, and the living conditions at the prison are deplorable for those who have tested positive. Exhibit A. The medical treatment is substandard at the prison for those who have the virus. In fact, the medical department has been overwhelmed with cases of COVID-19, and the staff is overtaxed. In addition, there is no respiratory therapy available at the prison. Which could clearly lead to death for people such as Ms. Miller. The

prison only has two nebulizer machines that must be shared. This places Ms. Miller in even more danger if she were to contract the virus.

At the time of this writing she will likely only have the antibodies for the virus. However, there is a fear of a second chance of contracting the virus, and fear that Miller may die in the event that she contracts the virus a second time. Miller would ask that the Court take judicial notice of reports on possible reinfection as well. See Exhibit B.

The second factor in this case that demonstrates that there is reason to reduce the sentence is the extraordinary record of rehabilitation that demonstrates that Miller is no longer a danger to public safety. This includes the completion of numerous rehabilitative programs, Exhibit C.

There are extraordinary and compelling reasons that militate for a reduction in sentence and that is the COVID-19 pandemic and the fact that Ms. Miller's safety and health are at high risk within the prison environment.

The Federal Bureau of Prisons has failed miserably in protecting prisoners. See Exhibit D.   In courts around the country, prosecutors have erroneously argued that inmates are safely quarantined in jails and prisons.[1]   Despite officials' best intent and efforts, prisons are unequipped to control coronavirus. The spread is not

---

[1] *See, e.g., U.S. v. Harthill,* No. 19-cr-217 (E.D. Wa. 2019) (ECF No. 29 at 7:5) (arguing proposed release address is "not shown to be safer . . . than his current housing situation" in the jail).
https://www.npr.org/sections/coronavirus-live-updates/2020/04/20/838943211/73-of-inmates-at-anohio-prison-test-positive-for-coronavirus

controlled and inmates are not safer in prison than on the street. A state prison in Ohio tested all inmates for the virus and 73% of the inmates tested positive. The large cluster of cases was found through mass testing of everyone at the Marion Correctional Institution; 109 staff members were also positive. "Because we are testing everyone — including those who are not showing symptoms — we are getting positive test results on individuals who otherwise would have never been tested because they were asymptomatic," according to the Ohio Department of Corrections. [2] It's clear this is not over yet. Dr. Anthony S. Fauci, the White House's COVID-19 task force's chief medical adviser, has said he expects cases to spike in closed environments like nursing homes, prisons and factories.[3]

Employees at federal prisons sounded the alarm that facilities lack the manpower to operate, the medical equipment to contain the virus, and the physical space to quarantine. A union representative for officers at the Oakdale facility in Louisiana, where the first death of a federal inmate occurred on March 28, 2020, reported, "[w]e don't know how to protect ourselves. Staff are working 36-hour shifts – there's no way we can keep going on like this."[4] According to one account, "more than a dozen workers in the Bureau of Prisons . . . have said that federal

---

[2] https://www.npr.org/sections/coronavirus-live-updates/2020/04/20/838943211/73-of-inmates-at-anohio-prison-test-positive-for-coronavirus
[3] https://www.nytimes.com/2020/05/11/health/coronavirus-second-wave-infections.html
[4] Kimberly Kindy, An Explosion of Coronavirus Cases Cripples a Federal Prison in Louisiana, Wash. Post (Mar. 29, 2020), https://www.washingtonpost.com/national/an-explosion-of-coronaviruscasescripples-a-federal-prison-in-louisiana/2020/03/29/75a465c0-71d5-11ea-85cb8670579b863d_story.html ("Kindy, Explosions of Coronavirus Cases")

prisons are ill-prepared for a coronavirus outbreak. Many lack basic supplies, like masks, hand sanitizer and soap."[5] A prison employee at the U.S. Penitentiary in Atlanta said, "We do not have enough masks; we do not have the supplies needed to deal with this. We don't have enough space to properly quarantine inmates." After the first employee death at the U.S. Penitentiary in Atlanta, employees reported "insufficient access to protective equipment and inconsistent communication about how many staff and inmates were infected at any given time.[6]

Ms. Miller's safety cannot be guaranteed with such a deadly pandemic that is ramping back up and expected to take off once again. As of this writing Ms. Miller is currently housed in an isolation unit due to her exposure to COVID-19. This is not the only issue that Miller is facing at the Coleman Complex. There was a breakout of Legionnaire disease earlier this year in which the source was never located. A lawsuit was filed as well in relation to that pandemic. See Exhibit E, Also See, **Kara Adams v. William Barr**, et al. 5-20-cv-60-Oc-35PRL Middle District of Florida – Ocala Division.

---

[5] Outbreaks in Jails and Prison Prove Hard to Contain, N.Y. Times, https://www.nytimes.com/interactive/2020/us/coronavirus-scases.html?referringSource=articleShare ("Outbreaks in Jails and Prisons") (last visited Apr. 23, 2020).
[6] Cassidy McDonald, *She was promoted a month before her death. Coworkers say she was never moved into her new role, away from sick inmates*, CBS News (Apr. 20, 2020), https://www.cbsnews.com/news/coronavirus-death-robin-grubbs-atlanta-federal-penitentiaryworkers-criticize-covid-19-response/.

The Coleman prison where she is housed currently has over 150+ confirmed inmate cases, 13 staff cases. See https://www.bop.gov/coronavirus/. The Court can and should consider this as an extraordinary and compelling reason militating for a sentence reduction.

Miller submits that the Court can also consider the unusually long sentence to which she was sentenced to for a non-violent drug offense.

All the above factors can be considered in determining whether extraordinary and compelling reasons exist in favor of reducing the sentence in this case, and or ordering home confinement.

## I. THIS COURT HAS AUTHORITY TO RESENTENCE MS. MILLER UNDER § 3582(C)(1)(A)(i) FOR THE EXTRAORDINARY AND COMPELLING REASONS PRESENTED HERE.

With the changes made to the compassionate release statute by the First Step Act, courts need not await a motion from the Director of BOP to resentence prisoners to time served under 18 U.S.C. § 3582(c)(1)(A)(i) for "extraordinary and compelling reasons," and the reasons that can justify resentencing need not involve only medical, elderly, or family circumstances.

**A. When Congress originally enacted § 3582 in 1984, it intended for district courts to reduce sentences for prisoners on the basis of extraordinary and compelling reasons not limited to medical, family, or elderly circumstances.**

Congress first enacted the modern form of the compassionate release statute contained in 18 U.S.C. § 3582 as part of the Comprehensive Crime Control Act of 1984. Section 3582(c) states that a district court can modify even a final "term of imprisonment" in four situations, the broadest of which is directly relevant here. A sentencing court can reduce a sentence if and whenever "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). In 1984, Congress conditioned the reduction of sentences on the BOP Director filing an initial motion in the sentencing court; absent such a motion, sentencing courts had no authority to modify a prisoner's sentence for extraordinary and compelling reasons. *Id.*

Congress never defined what constitutes an ***"extraordinary and compelling reason"*** for resentencing under § 3582(c). But the legislative history gives an indication of how Congress thought the statute should be employed by federal courts. One of Congress's initial goals in passing the Comprehensive Crime Control Act was to abolish federal parole and create a "completely restructured guidelines sentencing system." S. Rep No. 98-225, at 52, 53 n.74 (1983). Yet, recognizing that parole historically played

a key role in responding to changed circumstances, the Senate Committee stressed how some individual cases may still warrant a second look at resentencing:

> The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, cases in which **other extraordinary and compelling circumstances justify a reduction of an unusually long sentence**, and some cases in which the sentencing guidelines for the offense of which the defender was convicted have been later amended to provide a shorter term of imprisonment.

*Id.* at 55–56 (emphasis added). Rather than having the Parole Commission review every federal sentence focused only on an offender's rehabilitation, Congress decided that § 3582(c) could and would enable courts to decide, in individual cases, if *"there is a justification for reducing a term of imprisonment." Id.* at 56.

Congress intended for the situations listed in § 3582(c) to act as *"safety valves for modification of sentences," id.* at 121, that enabled sentence reductions when justified by various factors that previously could have been addressed through the (now abolished) parole system. This particular safety valve would *"assure the availability of specific review and reduction to a term of imprisonment for 'extraordinary and compelling reasons' and [would allow courts] to respond to changes in the guidelines." Id.* Noting that this approach

would keep *"the sentencing power in the judiciary where it belongs,"* rather than with a federal parole board, the statute permitted *"later review of sentences in particularly compelling situations." Id.* (emphasis added).

Congress thus intended to give federal sentencing courts an equitable power that would be employed on an individualized basis to correct fundamentally unfair sentences. And there is no indication that Congress limited the safety valve of § 3582(c)(1)(A) to medical or elderly release; if extraordinary and compelling circumstances were present, they could be used to "justify a reduction of an unusually long sentence." S. Rep No. 98-225, at 55–56.

**B. The U.S. Sentencing Commission concluded that § 3582(c)(1)(A)'s *"extraordinary and compelling reasons"* for compassionate release are not limited to medical, elderly, or family circumstances.**

Congress initially delegated the responsibility for determining what constitutes *"extraordinary and compelling reasons"* to the U.S. Sentencing Commission ("Commission"). See 28 U.S.C. § 994(t) ("The Commission . . . shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."). Congress provided only one limitation to that delegation of authority: "[r]ehabilitation of the defendant *alone* shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t)

9

(emphasis added). Congress no doubt limited the ability of rehabilitation *alone* to constitute extraordinary circumstances so that sentencing courts could not use it as a full and direct substitute for the abolished parole system. Congress, however, contemplated that rehabilitation could be considered with other extraordinary and compelling reasons sufficient to resentence people in individual cases. Indeed, the use of the modifier "alone" signifies just the opposite: that rehabilitation could be used in tandem with other factors to justify a reduction.

The Commission initially neglected its duty, leaving the BOP to fill the void and create the standards for extraordinary and compelling reasons warranting resentencing under § 3582(c)(1)(A). The Commission finally acted in 2007, promulgating a policy that extraordinary and compelling reasons includes medical conditions, age, family circumstances, and "other reasons." U.S.S.G. § 1B1.13, application note 1(A). After a negative DOJ Inspector General report found that the BOP had rarely moved courts for a § 3582(c)(1)(A) modification even for prisoners who met the objective criteria, see, U.S. Dep't of Justice Office of the Inspector General, *The Federal Bureau of Prisons' Compassionate Release Program* (Apr. 2013) ("FBOP Compassionate Release Program"), the Commission amended its policy statement, expanding the guidance to courts on qualifying

10

conditions and admonishing the BOP to file motions for compassionate release whenever a prisoner was found to meet the objective criteria in U.S.S.G. § 1B1.13. *Id.* at application note 4; see, also ***United States v. Dimasi***, 220 F. Supp. 3d 173, 175 (D. Mass. 2016) (discussing the progression from the OIG report to new "encouraging" guidelines).

The Commission created several categories of qualifying reasons: (A) "Medical Conditions of the Defendant," including terminal illness and other serious conditions and impairments; (B) "Age of the Defendant," for those 65 and older with serious deterioration related to aging who have completed at least 10 years or 75 percent of the term of imprisonment; (C) "Family Circumstances," where a child's caregiver or spouse dies or becomes incapacitated without an alternative caregiver; and (D) "Other Reasons," when the Director of the BOP determines there is "an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." *Id.*, application note 1(A). The Commission also clarified that the extraordinary and compelling reasons "need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment." U.S.S.G. § 1B1.13, application note 2. In other words, even if an "extraordinary and compelling reason reasonably could have been known or anticipated by the

sentencing court, [that fact] does not preclude consideration for a [sentence] reduction." *Id.*

Consistent with the text and legislative history of § 3582(c), the Commission concluded that reasons beyond medical, age, and family circumstances could qualify a s *"extraordinary or compelling reasons"* for resentencing, and that the extraordinary or compelling reasons need not be based on changed circumstances occurring after the initial sentencing of the defendant.

### C. Through the First Step Act, Congress changed the process for compassionate release based on criticism of BOP's inadequate use of its authority, returning to the federal judiciary the authority to act on its own to reduce sentences for *"extraordinary and compelling reasons."*

Prior to Congress passing the First Step Act, the process for compassionate release under § 3582(c)(1)(A) was as follows: the U.S. Sentencing Commission set the criteria for resentencing relief under § 3582(c), and the only way a sentencing court could reduce a sentence was if the BOP Director initiated and filed a motion in the sentencing court. See, PL 98–473 (HJRes 648), PL 98–473, 98 Stat 1837 (Oct. 12, 1984). If such a motion was filed, the sentencing court could then decide where *"the reduction was justified by 'extraordinary and compelling reasons' and was consistent with applicable policy statements issued by the Sentencing Commission."* *Id.* So, even if a

federal prisoner qualified under the Commission's definition of extraordinary and compelling reasons, without the BOP Director's filing a motion, the sentencing court had no authority to reduce the sentence, and the prisoner was unable to secure a sentence reduction. This process meant that, practically, the BOP Director both initiated the process and set the criteria for whatever federal prisoner's circumstances the Director decided to move upon.

Leaving the BOP Director with ultimate authority for triggering and setting the criteria for sentence reductions under § 3582(c)(1)(A) created several problems. The Office of the Inspector General found that the BOP failed: a) to provide adequate guidance to staff on the criteria for compassionate release; b) to set time lines for reviewing compassionate release requests; c) to create formal procedures for informing prisoners about compassionate release; and d) to generate a system for tracking compassionate release requests. See, *FBOP Compassionate Release Program*, at i–iv. As a result of these problems, the OIG concluded that "BOP does not properly manage the compassionate release program, resulting in inmates who may be eligible candidates for release not being considered." *Id.*; see, generally Stephen R. Sady & Lynn Deffebach, *Second Look Resentencing Under 18 U.S.C. § 3582(c) as an Example of Bureau of Prisons Policies That Result in Overincarceration*, 21 Fed. Sent. Rptr. 167 (Feb. 2009).

Congress heard those complaints. In late 2018, Congress passed the First Step Act, part of which transformed the process for compassionate release under § 3582(c)(1)(A). See, P.L. 115-391, 132 Stat. 5194, at § 603 (Dec. 21, 2018). Section 603 of the First Step Act changed the process by which § 3582(c)(1)(A) compassionate release occurs: instead of depending upon the BOP Director to determine an extraordinary circumstance and then move for release, a court can now resentence "upon motion of the defendant," if the defendant has fully exhausted all administrative remedies, "or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). Once the defendant who has properly exhausted files a motion, a court may, after considering the 18 U.S.C. § 3553(a) factors, resentence a defendant, if the court finds that extraordinary and compelling reasons warrant a reduction. *Id.* Any reduction of a sentence that a court orders must also be "consistent with applicable policy statements issued by the Sentencing Commission." *Id.* The effect of these new changes is to allow federal judges the ability to move on a prisoner's compassionate release application even in the face of BOP opposition or its failure to respond to a prisoner's request for compassionate release in a timely manner.

Congress made these changes in an effort to expand the use of compassionate release sentence reductions under § 3582(c)(1)(A). Congress labeled these changes, "*Increasing* the Use and Transparency of Compassionate Release." 164 Cong. Rec. H10346, H10358 (2018) (emphasis added). Senator Cardin noted in the record that the First Step Act made several reforms to the federal prison system, including that "[t]he bill *expands compassionate release* under the Second Chance Act and expedites compassionate release applications." 164 Cong. R. 199, at S7774 (Dec. 18, 2018) (emphasis added). In the House, Representative Nadler noted that First Step included "a number of very positive changes, such as . . . *improving application of compassionate release,* and providing other measures to improve the welfare of Federal inmates." 164 Cong. Rec. H10346-04, 164 Cong. Rec. H10346-04, H10362 (Dec. 20, 2018) (emphasis added).

Federal judges now have the power to order reductions of sentences even in the face of BOP resistance or delay in the processing of applications. The legislative history leading up to the enactment of the First Step Act establishes that Congress intended the judiciary not only to take on the role that BOP once held under the pre- First Step Act compassionate release statute as the essential adjudicator of compassionate release requests, but also to grant sentence

reductions on the full array of grounds reasonably encompassed by the "extraordinary and compelling" standard set forth in the applicable statute.

### D. Statutory text defines judicial sentence reduction authority around *"extraordinary and compelling reasons,"* and the policy statements of the U.S. Sentencing Commission under § 1B1.13 do not preclude this Court from resentencing petitioner.

Once a prisoner has properly pursued administrative remedies and filed a motion for compassionate release, a federal court possesses authority to reduce a sentence if and whenever the court finds "extraordinary and compelling reasons warrant such a reduction." A court must consider the 18 U.S.C. § 3553(a) sentencing factors in reducing any sentence, and any reduction of a sentence that a court orders must also be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A).

As noted above, the Sentencing Commission created a catch-all provision for compassionate release under U.S.S.G. § 1B1.13, application note (1)(D), which states:

> Other Reasons. — As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

The Commission also stated the process by which compassionate release reductions should be decided:

> Motion by the Director of the Bureau of Prisons. — A reduction under this policy statement may be granted only upon motion by the Director of the Bureau of Prisons pursuant to 18 U.S.C. § 3582(c)(1)(A).

U.S.S.G. § 1B1.13, application note 4.

The dependence on BOP in these policy statements is a relic of the prior procedure that is now inconsistent with the First Step Act's amendment of § 3582(c)(1)(A). Application note 1(D) can no longer limit judicial authority to cases with an initial determination by the BOP Director that a prisoner's case presents extraordinary or compelling reasons for a reduction, because the First Step Act has expressed allows courts to consider and grant sentence reductions even in the face of an adverse or unresolved BOP determination concerning whether a prisoner's case is extraordinary or compelling. See, 18 U.S.C. § 3582(c)(1)(A), as amended by P.L. 115-391 § 503 (Dec. 21, 2018). And the Commission's now-dated statement indicating that the BOP must file a motion in order for a court to consider a compassionate release sentence reduction no longer controls in the face of the new statutory text enacted explicitly to allow a court to consider a reduction even in the absence of a BOP motion. *Id.* With t h e First Step Act, Congress decided that federal judges are no longer constrained or controlled by how the BOP Director sets its criteria for what constitutes extraordinary and compelling reasons for a sentence reduction. Consequently, those sections of the application notes requiring a BOP

determination or motion are not binding on courts. See *Stinson v. United States*, 508 U.S. 36, 38 (1993) ("We decide that commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline."). Put differently, now that the First Step Act has recast the procedural requirements for a sentence reduction, even if a court finds there exists an extraordinary and compelling reason for a sentence reduction without the BOP Director's initial determination, then the sentence reduction is not inconsistent "with the applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A).

Most recently, Federal District Court Judge Laurie Smith-Camp reduced a stacked 924(c) sentence by 40 years, finding that in light of the First Step Act, she was entitled to do so. See, *United States v. Urkevich*, 2019 WL 6037391, (D. Neb. 11-14-19).

See also, *United States v. Redd*, 2020 WL 1248493 (E.D.Va. Mar. 16, 2020 in which Judge Anthony J. Trenga, in a very thorough decision outlined that the First Step Act granted authority to district courts to make findings as to what constitutes extraordinary and compelling reasons, and to reduce sentences if those findings were made.

In ***United States v. Maumau***, 2020 WL 80621 (2-18-20), U.S.
District Court Judge Tena Campbell found that extraordinary and
compelling reasons existed to reduce ***Maumau's*** sentence. Two of those
reasons were the extraordinarily lengthy sentence that was initially
imposed, and the defendant's young age at the time of the crime and
sentencing. See also, ***United States v. Young***, 2020 WL 1047815, at *6
(M.D. Tenn. Mar. 4, 2020). ***United States v. Chad Marks***, 03-CR-6033-L
(W.D.N.Y. April 20, 2020), reducing stacked 924(c) sentence in finding
that the rehabilitation by Marks and the change in 924(c) stacking law
constituted extraordinary and compelling reasons to reduce the 40-year
term of imprisonment. Thus, this Court can and should find extraordinary
reasons in this case and reduce the sentence of Adrianne Miller.

## E. ADRIANNE MILLER HAS EXTRAORDINARY AND COMPELLING REASONS WHY HER SENTENCE SHOULD BE REDUCED.

Many courts across the country have found that the First Step Act has
restored power to the people in the best position to decide if a reduction in
sentence is appropriate – Federal Sentencing Judges.

Miller submits that she is no longer a threat to public safety. The
biggest indication of that is her extensive rehabilitation. This includes
numerous rehabilitation programs, in conjunction with her excellent

disciplinary history and work history shown in Exhibit C. Here Ms. Miller works in a position of trust that is she is a Complex Driver where she operates vehicles without supervision. She has also earned glowing reports from Federal Prison staff that show who she is today. Case Manager C. Lopez writes, "My interaction with Ms. Miller has always been nothing less than pleasant, respectful and most importantly, she has displayed a very professional attitude towards staff and fellow inmates. She is dedicated, sincere and hard working." This is a testament as to who Ms. Miller is today, and the letter in full demonstrates that if released Miller is not a threat to public safety.

Miller is not just asking this Court to release her, but rather for a second chance to reclaim her life. To be the daughter, wife, and law-abiding citizen she was meant to be.

As mentioned above, this is a case that demonstrates there is extraordinary and compelling reasons that militate for a reduction in sentence. These include the facts that Miller has completed numerous rehabilitation programs and the fact that she has been infected with the COVID-19 virus. Many Courts have ordered reductions in sentence and released prisoners based on the COVID-19 pandemic; See *United States v. Morrison,* No. 19-cr-284-PWG, 2020 WL 3447757 (D Md. June 24, 2020); *United*

*States v. Martin*, No. DKC 04-0235-5, 2020 WL 3447760 (D Md. June 24, 2020);

*United States v. Davis*, 2:15-cr-00062-TLN, 2020 WL 3443400 (ED Cal. June 23, 2020);*United States v. Oaks*, No. RDB-17-0288, 2020 WL 3433326 (D Md. June 23, 2020); *United States v. Smith*, No. 4:18CR805 HEA, 2020 WL 3429150 (ED Mo. June 23, 2020); *United States v. Platte*, No. 05-cr-208-JD-KJM-2, 2020 WL 3441979 (ED Cal. June 22, 2020); *United States v. Salvagno*, No. 5:02-CR-51 (LEK), 2020 WL 3410601 (NDNY June 22, 2020); *United States v. Common*, No. 17-cr-30067, 2020 WL 3412233 (CD Ill. June 22, 2020); *United States v. Faafiu*, No. CR 17-0231 WHA, 2020 WL 3425120 (ND Cal. June 22, 2020); *United States v. Ladson*, No. 04-697-1, 2020 WL 3412574 (ED Pa. June 22, 2020); *United States v. Austin*, No. 06-cr-991 (JSR), 2020 WL 3447521 (SDNY June 22, 2020); *United States v. Lee*, No. 1:95-cr-58 (LMB), 2020 WL 3422772 (ED Va. June 22, 2020); *United States v. Bayuo*, No. 15-cr-576 (JGK), 2020 WL 3415226 (SDNY June 20, 2020); *United States v. Richardson*, No. 2:17-cr-00048-JAM, 2020 WL 3402410 (D Conn. June 19, 2020); *United States v. Garcia-Zuniga*, No. 19cr4139 JM, 2020 WL 3403070 (SD Cal. June 19, 2020); *United States v. Jackson*, No. 2:18-cr-86-PPS, 2020 WL 3396901 (ND Ind. June 19, 2020); *United States v. Calabrese,* No. 16-30033-TSH, 2020 WL 3316139 (D Mass. June 18, 2020); *United States v. Clark*, No. 4:08-CR-00096, 2020 WL 3395540 (SD Iowa June 17, 2020); *United States v. Joseph*, No. 18-CR-156, 2020 WL 3270885 (ED Wisc

June 17, 2020); *United States v. Johnson*, No. JKB-14-356, 2020 WL 3316221 (D

Md. June 17, 2020); *United States v. Kess*, No. ELH-14-480, 2020 WL 3268093

(D Md. June 17, 2020); *United States v. Quinn*, No. 91-cr-00608-DLJ-1 (RS),

2020 WL 3275736 (ND Cal. June 17, 2020); *United States v. Cruz*, No. 3:17-cr-

00075-JO-4, 2020 WL 3265390 (D Ore. June 17, 2020).

Another factor that this court can consider is the extraordinary length

of the sentence in this case for a non-violent drug offender. The sentence in

this case is an unusually long sentence in comparison to the average sentence of

those sentenced for drug crimes, and disproportionally severe compared to

sentences imposed on leaders of major drug trafficking organizations.

1. See Last of Arellano Felix Brothers Sentenced To 15 Years in Federal Prison, CBS 8, http://www.cbs8.com/story/23170978/last-of-arellano-felix-brothers-sentenced-to-15-years-infederal-prison (Aug. 19, 2013). The Arellano-Felix Drug Organization (AFO) was "once among the world's most violent and powerful multi-national drug trafficking organizations." The AFO was responsible for moving hundreds of tons of cocaine and marijuana from Mexico and Columbia into the United States, and it terrorized the South West United States borders with executions, torture, beheadings, kidnappings and bribes to law enforcement. In 2013, Eduardo Arellano-Felix, who acted as the CFO of the organization, was sentenced to 15 years. His brother Benjamin, also an organization leader, was previously sentenced to 25 years in Federal prison. The third brother and primary leader of the organization Javier was sentenced to life in prison.

2. See also Osiel Cardenas-Guillen, Former Head of the Gulf Cartel, Sentenced to 25 Years' Imprisonment, FBI, (Feb. 24, 2010), https://archives.fbi.gov/archives/houston/pressreleases/2010/ho022410b.htm . Osiel Cardenas-Guillen was the former head of the Gulf Cartel,

which was responsible for importing thousands of kilograms of cocaine into the United States from Mexico and using violence and intimidation to further the goals of the criminal enterprise. In 2010, Cardenas-Guillen was sentenced to 25 years in federal prison.

3. See also Notorious Ex-Cocaine Kingpin George Jung Out of Prison, Living In San Francisco, CBS (June 3, 2014), https://sanfrancisco.cbslocal.com/2014/06/03/notorious-excocaine-kingpin-george-jung-out-of-prison-living-in-san-francisco/ . George Jung was responsible for 85 percent of the cocaine smuggled into the United States in the 1970's and 1980's. He was released from Federal prison in 2014 after serving approximately 20 years.

4. See also Griselda Blanco Biography, BIOGRAPHY (last updated July 18, 2019), https://www.biography.com/crime-figure/griselda-blanco . Griselda Blanco, known as the cocaine Godmother and the Queen of cocaine, was a drug lord of the Medellin cartel, and a pioneer in the Miami-based cocaine drug trade and the underworld during the 1970's and early 1980's. She was the suspect of over 200 murders and was sentenced to 15 years in Federal prison.

The issues before this Court demonstrate that there are extraordinary and compelling reasons to reduce the sentence.

At the time of sentencing what decision makers cannot measure is the capacity for people to change. However, some people do. Adrianne Miller is one of those people. President Trump himself acknowledged that people do change, and he did so when he released Alice Marie Johnson through clemency from the life sentence that was imposed on her. We also saw Matthew Charles released from prison based on the *First Step Act* - and it was President Trump who invited Mr. Charles to the State of The Union Address. When the Court originally

sentenced Mr. Charles to 35 years in prison, it could not have foreseen the changes

that he made in his life - never receiving a disciplinary report while in prison,

helping others with their legal pleadings, studying the bible, teaching GED classes.

Mr. Charles changed his character so much that the President invited this man to

the State of the Union address. Charles' original sentence of 35 years was largely

driven because of his criminal history. At the time of sentencing, the sentencing

judge explained that Mr. Charles had "a particularly violent history" and "had

demonstrated by his actions that he's a danger to society and should simply be off

the streets." *United States v. Charles*, 843 F.3d 1142, 1145, (6th Cir. 2016), (Dkt.

# 96 Sentencing Transcript @ page 283). That history included "kidnapping a

woman on two consecutive days for the purpose of terrorizing her; burglarizing a

home; fleeing from a police interrogation, shooting a man in the head, and

attempting to run off in the victim's car. Mr. Charles is now a free man living a

law-abiding life despite this record, after having served 21 years in prison. Charles

sentence is not much more than the current sentence in Millers case – who had no

violence. Charles case is an example that people do change, and do deserve

second chances.

President Trump also had Alice Marie Johnson at the State of the Union

address after granting her clemency on the life sentence that was imposed on her

for being involved in drug trafficking. This is a testament that deserving people should be given second chances in a nation that prides itself on second chances.

Adrianne Miller is one of those people that deserve a second chance to reclaim her life. Like Matthew Charles, and Alice Johnson - Ms. Miller also changed her character. She submits to this Court that she is worthy of a second chance to reclaim her life the same as Mr. Charles and Ms. Johnson.

Adrianne Miller has also completed rehabilitation programs and this Court can consider that rehabilitation as well and should. As this is the biggest indicator that she is no longer a threat to public safety. One of the factors in which the Court must consider and the Court should also consider whether, upon release, the defendant would pose "a danger to the safety of any other person or to the community." In that regard, this Court is not faced with a stark choice between simply turning Miller loose, or continuing her incarceration. The Court has the option of reducing Miller's period of incarceration, followed by a term of supervised release. Supervised release, which is laid out at 18 U.S.C. § 3583, was created by Congress as "a form of post confinement monitoring overseen by the sentencing court." *Johnson v. United States*, 529 U.S. 694, 696-97 (2000). As the Supreme Court has explained, "Congress intended supervised release to assist individuals in their transition to community life.

Supervised release fulfills rehabilitative ends," providing "individuals with post confinement assistance" through the supervision of the court. United States v. Johnson, 529 U.S. 53, 59 (2000). "The court can provide such assistance because, '[w]hile on supervised release, the offender [is] required to abide by certain conditions,' *Johnson v. United States*, 529 U.S. at 697, such as regularly reporting to a probation officer, pursuing schooling or work, and refraining from further criminal activity, see U.S.S.G. § 5D1.3(c); 18 U.S.C. § 3583(d)." *United States v. Island*, 916 F.3d 249, 253 (3d Cir. 2019). Congress has also authorized supervising courts to revoke supervised release and order re-imprisonment when defendants fail to meet their release conditions. See 18 U.S.C. § 3583(e); *Johnson v. United States*, 529 U.S. at 697. Supervised release is routinely imposed as a component of sentencing, including sentences for crimes far more serious than those of which Miller has been convicted. Supervised release affords the court an array of conditions which it can impose, the defendant's compliance with which will be monitored by a probation officer. New conditions can be added as necessary.

Beyond the low risk that Miller now presents, whatever risk there is can be further mitigated by supervised release. See, *United States v.*

*Williams*, No. 04cr95, 2020 WL 1751545, at *3 (N.D. Fla. Apr. 1, 2020) (although court could not conclude that defendant posed no risk at all to public safety, "the risk of him engaging in further criminal conduct is minimal and can be managed through home confinement and the terms of his supervised release").

Ms. Miller submits that there is nothing left to gain in continuing her incarceration but suffering. The rehabilitation has been achieved in this case. Ms. Miller submits that she is no longer a threat to public safety, and ask that this Court grant her motion for a reduction in sentence to time served.

If released Ms. Miller would be living with Adrienne and Richard Young at 2455 Snow Road N Semmes, AL 36575. She has strong family support that are willing and ready to assist her in a successful reentry. See Exhibit F.

Adrianne Miller has attempted to submit a request to the Warden at her facility seeking compassionate release. She was told that none were being accepted. Ms. Miller has attempted to exhaust the Administrative Remedy and has hit roadblocks every step of the way. However, 30 days have lapsed without the warden or the BOP filing a motion with this Court on her behalf after she has attempted to make the request. Exhibit G - Affidavit of Adrianne Miller. Prisoners

are no longer permitted to work in the prison due to the COVID-19 outbreak. Thus, staff has been transferred to other departments such as the kitchen, and laundry leaving no staff to answer compassionate release request. With no response or any way to file a request Miller has exhausted her remedy as indicated by the plain text of the First Step Act. Thus, this motion is ripe for this Court's review.

## CONCLUSION

**President** Abraham Lincoln once said, *"I have always found that mercy bears richer fruits than strict justice."* Adrianne Miller request that this Court grant her request for a reduction in sentence based on extraordinary and compelling reasons. Millers request is a request for a second chance to reclaim her life and be the daughter, wife, - and law-abiding citizen she was meant to be.

Respectfully Submitted,

*Adrianne D. Miller*

Adrianne Miller

Dated: August _27_ , 2020

# CERTIFICATE OF SERVICE

I, Adrianne Miller, hereby certify that on this _27_ day of August, 2020, I

did place the enclosed Motion Requesting Reduction in Sentence Pursuant to 18

U.S.C. § 3582, in the prison mailing system addressed to the following parties:

>United States District Court Clerk
>Southern District Alabama
>155 St. Joseph Street
>Mobile, AL  36602
>
>United States Attorney's Office
>63 S. Royal Street, #600
>Mobile, AL  36602

Signed under the penalty of perjury

this _27th_ day of August, 2020.


_Adrianne D. Mi_

Adrianne Miller

EXHIBIT A



| Patient Information | Specimen Information | Client Information |
|---|---|---|
| **MILLER, ADRIANNE**<br><br>**DOB: Not Given**    **AGE: Not Given**<br>Gender:   NG    Fasting: U<br>Phone:   NG<br>Patient ID: 15437-009 | Specimen:   TM196974J<br>Requisition: 4129588<br><br>Collected:   07/08/2020 / 11:00 EDT<br>Received:   07/13/2020 / 20:56 EDT<br>Reported:   07/15/2020 / 21:04 EDT | Client #: 66002685    31LE999<br>NEGRON, IVAN L<br>COLEMAN FCC-CAMP<br>846 NE 54TH TERR<br>COLEMAN, FL 33521 |

| Test Name | In Range | Out Of Range | Reference Range | Lab |
|---|---|---|---|---|
| SARS CoV 2 RNA(COVID 19), QUALITATIVE NAAT | | | | D45 |
|   **SARS CoV 2 RNA** | | **Detected** | Not Detected | |

A Detected result is considered a positive test result for COVID-19.
This indicates that RNA from SARS-CoV-2 (formerly 2019-nCoV) was
detected, and the patient is infected with the virus and presumed to
be contagious. If requested by public health authority, specimen will
be sent for additional testing.

Please review the FDA authorized labeling available for health care
providers and patients using the following website:
https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/
prevention.html

This test has been authorized by the FDA under an
Emergency Use Authorization (EUA) for use by authorized laboratories.
In order to serve patients during this public health crisis, samples
from appropriate clinical sources are being tested. Negative test
results derived from specimens received in non-commercially
manufactured viral collection and transport media, or in media and
sample collection kits not yet authorized by FDA for COVID-19 testing
should be cautiously evaluated and the patient potentially subjected
to extra precautions such as additional clinical monitoring,
including collection of an additional specimen.

Methodology:
Nucleic Acid Amplification Test (NAAT) includes PCR or TMA

**PERFORMING SITE:**
D45    CREATIVE TESTING SOLUTIONS, 10100 DR MARTIN LUTHER KING JR STREET N, SAINT PETERSBURG, FL 33716-3806 Laboratory Director: MERRI B MAIR, MD, CLIA: 10D2002322

Quest, Quest Diagnostics, the associated logo and all associated Quest Diagnostics marks are the trademarks of Quest Diagnostics.

| Inmate Name: | MILLER, ADRIANNE DAVIS | | | Reg #: | 15437-002 |
|---|---|---|---|---|---|
| Date of Birth: | 05/09/1978 | Sex: | F | Race: | WHITE |
| Encounter Date: | 07/16/2020 15:06 | Provider: | Lab Result Receive | Facility: | COL |

**Reviewed by Criswell, Linda PA-C on 07/16/2020 16:46.**

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | MILLER, ADRIANNE DAVIS | | | Reg #: | 15437-002 |
| Date of Birth: | 05/09/1978 | Sex: | F | Race: | WHITE |
| Encounter Date: | 07/16/2020 15:06 | Provider: | Lab Result Receive | Facility: | COL |

**Cosigned by Franco, Karina MD on 07/23/2020 12:11.**

EXHIBIT B



Home / Diseases, Conditions, Syndromes

MAY 4, 2020

# Can survivors get reinfected with coronavirus?

by Amy Norton, Healthday Reporter



(HealthDay)—People all over the globe who've recovered from the new coronavirus want to know the same thing: Am I immune, at least for a while? A new study of common coronaviruses is not exactly reassuring.

Researchers found it was "not uncommon" for people with run-of-the-mill coronaviruses (not the one that causes COVID-19) to have a repeat infection within a year. Of 86 New York City residents infected with those coronaviruses, 12 tested positive for the same bug again.

A big caveat is, the study looked only at the four coronaviruses that are endemic in humans—the kind that cause nothing worse than cold symptoms.

"They're kind of wimpy," said researcher Jeffrey Shaman, a professor of environmental health sciences at Columbia University Mailman School of Public Health. "People rarely have to go to the doctor for these infections."

So it's hard to know, Shaman said, whether our experiences with endemic coronaviruses will translate to SARS-CoV-2—the coronavirus that causes COVID-19.

"It's not the same as these endemic viruses," Shaman said. "But obviously, we can't look at repeat infections with [SARS-CoV-2], because it's new."

In lieu of that, he said, analyzing the patterns of regular coronaviruses—how often reinfections occur, and in what time frame—may at least give a sense of what could happen with the new virus.

For the study, Shaman and colleague Marta Galanti looked at data on 191 healthy adults and children living in New York City. Between fall 2016 and spring 2018, the participants regularly gave nasal swab samples and reported on any respiratory symptoms they were having.

Overall, 86 tested positive for a coronavirus infection at some point. Of those people, 12—or about 14%—tested positive for the same virus within a year.

And there was no evidence that people's symptoms were any different—either milder or worse—the second time around.

The findings have not, however, been published in a scientific journal yet. According to Shaman, they are undergoing peer review—the process by which journals decide whether a study is strong enough for publication.

For now, they leave some open questions. It's not clear, for example, that those 12 repeat positives were all actually repeat infections, Shaman said. That's particularly true in cases where the "new" positive result came within weeks of the first, he noted. There, the test may simply have detected the original virus again.

A similar issue is playing out right now with COVID-19, said Dr. Bruce Y. Lee, professor of health policy management at City University of New York Graduate School of Public Health.

There have been some reports of people who'd recovered from the disease testing positive for the virus again.

But, Lee said, those cases seem to reflect issues with the tests—including detection of "dead fragments" of the virus, rather than a new infection.

However, in the current study, many of the repeat positives happened months after the first infection, Shaman said—as far out as 48 weeks. It's more likely those would be repeat infections.

Shaman said genetic analyses are being carried out to help confirm which cases are true reinfections.

The study also raises the question of who, exactly, is prone to reinfection—at least with common coronaviruses. Nine of the 12 repeat positives were in children between the ages of 1 and 9 years. It's not clear why, but Shaman speculated that their immature immune systems could have something to do with it.

Beyond that, all of the study participants lived in densely populated New York City, and some were health care workers. Shaman said the rate and speed of reinfections in the group might not be seen elsewhere.

Lee, who was not involved in the study, agreed it's hard to know what kind of relevance these findings have to the current pandemic. "The challenge with this new coronavirus is that it behaves differently," he said.

The closest comparison that could be made, Lee said, is with SARS-CoV—the virus that caused the multi-country SARS outbreak in 2003. Studies have found that people who recovered from SARS maintained antibodies to it for an average of two years.

But, Shaman said, the mere presence of antibodies does not equal immunity: They need to be effective antibodies, in sufficient numbers.

Those questions are important not only to individuals, but to public policy. Some governments have proposed giving "immunity passports" to people who test positive for antibodies to SARS-CoV-2—allowing them to return to work or to travel, under the assumption they won't get infected again.

But the World Health Organization has cautioned against the notion, saying there is no evidence that having antibodies to the new coronavirus guarantees protection from reinfection.

Lee underscored that point. "It's helpful to be tested for antibodies," he said. "If you have them, you might have immunity. But that cannot be assumed."

**More information:** The U.S. Centers for Disease Control and Prevention has more on coronavirus antibody testing.

Copyright © 2020 HealthDay. All rights reserved.

**Citation**: Can survivors get reinfected with coronavirus? (2020, May 4) retrieved 21 July 2020 from https://medicalxpress.com/news/2020-05-survivors-reinfected-coronavirus.html

EXHIBIT C

# Certificate of Achievement

## Adrianne Miller

has successfully completed the

### RESIDENTIAL
### LIFE CONNECTIONS PROGRAM

April 19, 2018

_____
B. Ford, Chaplain, Program Manager

_____
N. Blackerby, Spiritual Guide

_____
M. Majidullah, Spiritual Guide

_____
T. Boyd, Program Facilitator

_____
B. Wood, Spiritual Guide

_____
K. Mobley, Mentor Coordinator





# CERTIFICATE OF COMPLETION

Awarded To

## **Adrianne Miller**

On behalf of the Social Work Department of FCI Aliceville for your completion of the treatment group,

### **"WOMEN'S RELATIONSHIPS"**

in which you completed  9 hours.
Given this 28th day of March, 2016

I. Lewis, LGSW, Social Worker

# FCI Aliceville, Alabama



## Drug Education

# CERTIFICATE OF COMPLETION

This certifies that

## Adrianne Miller

has successfully completed all requirements of Drug Education.

This certificate of completion is hereby issued
this 24th day of March, 2016

*Mrs Black*

Mrs. Black, Drug Treatment Specialist

# Federal Bureau of Prisons

## FCI Aliceville, Aliceville Alabama

*THIS CERTIFICATE ACKNOWLEDGES THAT*

## Adrianne Miller

*HAS SUCCESSFULLY COMPLETED*

### SUICIDE PREVENTION WORKSHOP
### (REENTRY - 3 HOURS)

*AND IS THEREFORE AWARDED THIS CERTIFICATE.*



_____
E. JENKINS, REENTRY COORDINATOR

DECEMBER 5, 2015
DATE

 

# SISTA PROGRAM

**This is to certify that**

Adrianne Miller

**Has successfully completed 5 session of the SISTA Program**

## Certificate of Graduation

5/31/14

Ann James

# *Certificate of Completion*

awarded to:

## Adrianne Miller

ACCESS: Advancing Career Counseling and Employment Support for Survivors of

Domestic Violence

*November 7, 2017*

*Karla Thornburg, LCSW*



# Certificate of Achievement

## This certificate is awarded to

# ADRIANNE MILLER

who successfully completed the Foundation Program designed to assist women in
assessing individual needs and translating needs into the selection of programs and plans
to meet individual goals. Requirements include completion of a Personal Priorities Plan,
journaling, homework assignments, and a community service project.

_Signature_      Briscoe, LCSW      10/12/17 _Date_

_Signature_      M. Little, LCSW      10-12-17 _Date_



# Certificate of Completion

### This Certifies that

## Adrianne Miller

*Has successfully completed with proficiency the*

## FCI Aliceville Life Management Skills I Course
## & is hereby awarded 15 Sentry Credit Hours



Given this **14**th day of **November** in the year of **2015.**

---

**Recreation Specialist**



# Certificate of Completion

FMC Carswell

This award is presented to:
## Adrianne Miller

For successful completion of the:
# Trauma in Life Workshop

January 5, 2018

N. Bartholomew, Ph.D.
Resolve Program Coordinator

# Certificate of Participation

This Is To Certify That

## Adrianne Miller

Has Participated In

## PARENTING WORKSHOP

at FCI Aliceville, Aliceville, Alabama

_A.Stargell_

A.Stargell, Parenting Coordinator

# Certificate of Completion



This Certification Acknowledges

## *ADRIANNE MILLER*

Has successfully completed the Adult Continuing Education Course Work

at FCI Aliceville, Aliceville, Alabama

for

## PUBLIC SPEAKING

on Tuesday, December 22, 2015

_S. Evans_

S. Evans, ACE Coordinator

# Certificate of Participation

This Is To Certify That

## Adrianne Miller

Has Participated In

## PARENTING FROM WITHIN

at FCI Aliceville, Aliceville, Alabama



A.Stargell, Literacy Coordinator

# Certificate of Completion



This Certification Acknowledges

## *ADRIANNE MILLER*

Has successfully completed the Adult Continuing Education Course Work

at FCI Aliceville, Aliceville, Alabama

for

## Native American

on Tuesday, June 21, 2016

*Evans*

S. Evans, ACE Coordinator

# Certificate of Completion



This Certification Acknowledges

## *ADRIANNE DAVIS MILLER*

Has successfully completed the Adult Continuing Education Course Work

at FCI Aliceville, Aliceville, Alabama

for

## Beginners Law Library

on Tuesday, May 3, 2016

*S. Evans*

—————————————————————
S. Evans, ACE Coordinator

# Certificate of Completion

# COME OUT
## FOR HEALTH

## FOR INSTRUCTING 20 HOURS OF
## HEALTH AWARENESS
## AT FCI ALICEVILLE
## RECREATION DEPARTMENT

Issued on 10th day of September, in the year of 2015

Recreation Specialist



# CERTIFICATE OF COMPLETION

## THIS CERTIFICATE IS AWARDED TO

### ADRIANNE MILLER

For completion of 16 hours of
Beginners Sign Language Class.

CERTIFICATE AWARDED ON
NOVEMBER 18, 2015

Recreation Specialist

# Certificate of Achievement

*Awarded to*

MILLER, ADRIANNE

*for superior achievement and excellence in*

BEGINNER GUITAR CLASS

*this* 20TH *day of* SEPTEMBER

*in the year* 2018 .

*Signed*

N. PALMERTON / RECREATION SPECIALIST



Excellence

# Certificate of
# Achievement

*Awarded to*

ADRIANNE MILLER

*for superior achievement and excellence in*

FUN CRAFT RUG BRAIDING

*this* 22 *day of* OCTOBER

*in the year* 2016 .

*Signed*

R. SWORD/RECREATION SPECIALIST





CERTIFICATE OF

# Attendance

## Waiting Here For You

### An Advent
### Journey of Hope

*Class Dates: 11/16/18-01/07/19 – 4.5 Hours*

This Certificate is Awarded to:

## Adrianne Miller

Thank You for Your Perseverance, Time, Attention and Participation.
May Your Faith Continue to Reflect the Knowledge You've Learned.

*Video Series*

Mr. Wood, Protestant Spiritual Guide, LCP, FMC Carswell

1/10/19

Date



CERTIFICATE OF

# Attendance

## The Comeback

It's Not Too Late and
You're Never Too Far

This Certificate is Awarded to:

### Adrianne Miller

Thank You for Your Perseverance, Time, Attention and Participation.
May Your Faith Continue to Reflect the Knowledge You've Learned.

_Video Series_

Mr. Wood, Protestant Spiritual Guide, LCP, FMC Carswell

10/10/18

Date

## CERTIFICATE OF

# Attendance

## Label Maker

### Who or What is
### Defining You



*Video Series*

This Certificate is Awarded to:

## Adrianne Miller

Thank You for Your Perseverance, Time, Attention and Participation.
May Your Faith Continue to Reflect the Knowledge You've Learned.

_Mr. Wood_, Protestant Spiritual Guide, LCP, FMC Carswell

10/10/18

Date



# Source of Light Kansas

*Discipleship Training Branch of SLMI*

PO Box 149 -- Newton, KS 67114



# Bible Correspondence Course Certificate

## Adrianne Miller

having satisfactorily completed

### Country Called Heaven

is granted this Certificate by Source of Light Ministries International in recognition of this achievement on this

September 24, 2015

| *Ron Barnes* | *Ray Walker* | *H. Leon Scott* |
|---|---|---|
| General Director | International Schools Director | Representative |
| SLM International | SLM International | |



*"The things that thou has heard of me among many witnesses, the same commit thou to faithful men, who shall be able to teach others also."*

2 Timothy 2:2

## Record of Grades for Bible Correspondence Course
## Country Called Heaven

| Lesson | Grade | | Lesson | Grade |
|---|---|---|---|---|
| Lesson 1 | A+ | | Lesson 16 | A+ |
| Lesson 2 | A+ | | Lesson 17 | A+ |
| Lesson 3 | A+ | | Lesson 18 | A+ |
| Lesson 4 | A- | | | |
| Lesson 5 | A+ | | | |
| Lesson 6 | A+ | | | |
| Lesson 7 | A+ | | | |
| Lesson 8 | A+ | | | |
| Lesson 9 | A+ | | | |
| Lesson 10 | A+ | | | |
| Lesson 11 | A+ | | | |
| Lesson 12 | A+ | | | |
| Lesson 13 | A+ | | | |
| Lesson 14 | A+ | | | |
| Lesson 15 | A+ | | | |

## CERTIFICATE OF

# Attendance

## Boy Meets Girl



### Louie Giglio
### On Biblical Relationships

This Certificate is Awarded to:

## Adrianne Miller

Thank You for Your Perseverance, Time, Attention and Participation.
May Your Faith Continue to Reflect the Knowledge You've Learned.



_Mr. Wood, Protestant Spiritual Guide, LCP, FMC Carswell_

3/15/17
Date

# Federal Bureau of Prisons
## FCI Aliceville, Aliceville Alabama

*THIS CERTIFICATE ACKNOWLEDGES THAT*

## Adrianne Miller

*HAS SUCCESSFULLY COMPLETED*

## Legal Expungement

*AND IS THEREFORE AWARDED THIS CERTIFICATE.*



*E. Jenkins*

E. JENKINS, REENTRY COORDINATOR

APRIL 24-30, 2016

DATE

# Federal Bureau of Prisons
## FCI Aliceville, Aliceville Alabama

*THIS CERTIFICATE ACKNOWLEDGES THAT*

**Adrianne Miller**

*HAS SUCCESSFULLY COMPLETED*

**Budget and Finance**

*AND IS THEREFORE AWARDED THIS CERTIFICATE.*

E. JENKINS, REENTRY COORDINATOR



APRIL 24-30, 2016

DATE

# Federal Bureau of Prisons
## FCI Aliceville, Aliceville Alabama

*THIS  CERTIFICATE  ACKNOWLEDGES THAT*

**Adrianne Miller**

*HAS SUCCESSFULLY COMPLETED*

**Christian Womens Job Corp**

*AND  IS THEREFORE AWARDED THIS CERTIFICATE.*



E. JENKINS, REENTRY COORDINATOR

APRIL 24-30, 2016

DATE

# Federal Bureau of Prisons

## FCI Aliceville, Aliceville Alabama

*THIS CERTIFICATE ACKNOWLEDGES THAT*

## Adrianne Miller

*HAS SUCCESSFULLY COMPLETED*

## Buying a Home

*AND IS THEREFORE AWARDED THIS CERTIFICATE.*



E. JENKINS, REENTRY COORDINATOR

APRIL 24-30, 2016

DATE

# Federal Bureau of Prisons
## FCI Aliceville, Aliceville Alabama

*THIS CERTIFICATE ACKNOWLEDGES THAT*

## Adrianne Miller

*HAS SUCCESSFULLY COMPLETED*

## Samford University Seminar

*AND IS THEREFORE AWARDED THIS CERTIFICATE.*



E. JENKINS, REENTRY COORDINATOR

APRIL 24-30, 2016

DATE

# Federal Bureau of Prisons
## FCI Aliceville, Aliceville Alabama

*THIS CERTIFICATE ACKNOWLEDGES THAT*

Adrianne Miller

*HAS SUCCESSFULLY COMPLETED*

HIV / AIDS

*AND IS THEREFORE AWARDED THIS CERTIFICATE.*



E. JENKINS, REENTRY COORDINATOR

APRIL 24-30, 2016

DATE

# Federal Bureau of Prisons
## FCI Aliceville, Aliceville Alabama

THIS CERTIFICATE ACKNOWLEDGES THAT

*Adrianne Miller*

HAS SUCCESSFULLY COMPLETED

*Tascaloosa Health Dept.*

AND IS THEREFORE AWARDED THIS CERTIFICATE.



E. JENKINS, REENTRY COORDINATOR

APRIL 24-30, 2016

DATE

# Federal Bureau of Prisons
## FCI Aliceville, Aliceville Alabama

*THIS CERTIFICATE ACKNOWLEDGES THAT*

**Adrianne Miller**

*HAS SUCCESSFULLY COMPLETED*

**Voter Registration**

*AND IS THEREFORE AWARDED THIS CERTIFICATE.*



_____
E. JENKINS, REENTRY COORDINATOR

APRIL 24-30, 2016
DATE

# Federal Bureau of Prisons
## FCI Aliceville, Aliceville Alabama

THIS CERTIFICATE ACKNOWLEDGES THAT

**Adrianne Miller**

HAS SUCCESSFULLY COMPLETED

**Probation Seminar**

AND IS THEREFORE AWARDED THIS CERTIFICATE.

E. Jenkins

E. JENKINS, REENTRY COORDINATOR



APRIL 24-30, 2016

DATE

# Federal Bureau of Prisons
## FCI Aliceville, Aliceville Alabama

*THIS CERTIFICATE ACKNOWLEDGES THAT*

*Adrianne Miller*

*HAS SUCCESSFULLY COMPLETED*

*Senior Services*

*AND IS THEREFORE AWARDED THIS CERTIFICATE.*



_____
E. JENKINS, REENTRY COORDINATOR

_____
APRIL 24-30, 2016
DATE

# Federal Bureau of Prisons

## FCI Aliceville, Aliceville Alabama

*THIS CERTIFICATE ACKNOWLEDGES THAT*

**Adrianne Miller**

*HAS SUCCESSFULLY COMPLETED*

**Domestic Violence**

*AND IS THEREFORE AWARDED THIS CERTIFICATE.*



E. JENKINS, REENTRY COORDINATOR

APRIL 24-30, 2016

DATE

# Federal Bureau of Prisons
## FCI Aliceville, Aliceville Alabama

*THIS CERTIFICATE ACKNOWLEDGES THAT*

Adrianne Miller

*HAS SUCCESSFULLY COMPLETED*

Prison Fellowship

*AND IS THEREFORE AWARDED THIS CERTIFICATE.*



_____
E. JENKINS, REENTRY COORDINATOR

APRIL 24-30, 2016
DATE



CERTIFICATE OF

# Attendance

## Goliath Must Fall

**Winning the Battles
Against Your Giants**

This Certificate is Awarded to:

# Adrianne Miller

Thank You for Your Perseverance, Time, Attention and Participation.
May Your Faith Continue to Reflect the Knowledge You've Learned.

3/12/18

Mr. Wood, Protestant Spiritual Guide, LCP, FMC Carswell

Date

# THE BOOK OF ACTS

## Adrianne Miller

MARCH
2017

*M. Boyd*
CHAPLAIN

a study

# THE BOOK OF

# JAMES

## CERTIFICATE *of* ACHIEVEMENT

THIS ACKNOWLEDGES THAT

## Adrianne Miller

MAY
23
2017

, *Chaplain T Boyd*

# CERTIFICATION of ACHIEVEMENT

THIS ACKNOWLEDGES THAT

## Adrianne Miller

HAS SUCCESSFULLY COMPLETED

## BOOK OF ROMANS

COMPLETION DATE 2018

SIGNED BY | CHAPLAIN BOYD

CERTIFICATE OF

# Completion
# GALATIANS



Freedom From Captivity
Freedom From the Law
Freedom in Christ

This Certificate is Awarded to:

## Adrianne Miller



Bible Study Series

Thank You for Your Perseverance, Time, Attention and Participation.
May Your Faith Continue to Reflect the Knowledge You've Learned.

Mr. Wood, Protestant Spiritual Guide, LCP, FMC Carswell

8/6/18

Date

# CERTIFICATE OF
# COMPLETION





## JOURNEY TO BETHLEHEM

This certificate is awarded to

### Adrianne Miller
### December 2018

Thank You for Your Perseverance, Time, Attention and Participation.
May Your Life Continue to Reflect the Knowledge You've Learned.

T. Clark, Supervisory Chaplain - FMC Carswell

1/14/19
Date



# CERTIFICATE
## of
## Completion

Let it be known that
ADRIANNE MILLER

Has satisfactorily completed the _2___ hour requirement
For the Education course entitled:

LIFE ETERNAL CLONES

At FMC Carswell, Fort Worth, Texas

Supervisor of Education



# Emmaus Correspondence School

## Rehabilitation by Regeneration



**This certifies that**

Adrianne Miller

**has successfully completed**

Men who met the Master

**by correspondence**

# Emmaus Correspondence School

## Rehabilitation by Regeneration



**This certifies that**

Adrianne Miller

**has successfully completed**

Born

To

Win

**by correspondence**



# CERTIFICATE *of* COMPLETION

THIS ACKNOWLEDGES THAT

ADRIANNE MILLER

HAS SUCCESSFULLY COMPLETED THE 6 HOUR REQUIREMENT
AT **FMC CARSWELL, FORT WORTH, TX**
FOR THE EDUCATION COURSE ENTITLED:



OCTOBER 11,
2017

100 WAYS TO MOTIVATE YOURSELF

K. FLEMING, ACE COORDINATOR



# CERTIFICATE
## of
## Completion

*Let it be known that*

ADRIENE MILLER

*Has satisfactorily completed the* __6__ *hour requirement*
*For the Education course entitled:*

MODERN MARVELS 1

*At FMC Carswell, Fort Worth, Texas*

*Supervisor of Education*

U.S. Department of Justice

Federal Bureau of Prisons

BP-251 (42)
Jan 1987



U.S. Department of Justice
Federal Bureau of Prisons

15437-002

MILLER
ADRIANNE
Eye: HL   Ht: 5'05"

INMATE

USP LVN

FCC COLEMAN
Institution

# INMATE DRIVER'S PERMIT
### and Identification Card

Adrianne Miller        15437002
(Name)                    (Number)

This inmate is authorized to drive
a _____
_____

GOOD ONLY ON THE RESERVATION

_____
Garage Foreman

Approved

_____
Associate Warden

Previous editions not usable



June 10, 2020

Miller, Adrianne Davis
Register No: 15437-002

Re: Inmate Performance

To whom it may concern:

Ms. Miller has been an inmate of the Federal Correctional Complex Camp in Coleman, Florida since March 2019. My interaction with Ms. Miller has always been nothing less than pleasant, respectful and most importantly, she has displayed a very professional attitude towards staff and fellow inmates. She is dedicated, sincere and hard working. It is my strong belief that Ms. Miller has worked extremely hard for consideration for a reduction of her sentence. She has also proven herself to be an excellent mentor to the other inmates, self-motivated, trust worthy and a respectful person. She has gained significant knowledge, experience and skill sets at the various jobs she has held while here at Coleman. Her interpersonal skills are to be admired. As her case manager, I have provided numerous sessions of counseling to Ms. Miller and have found her to be very regretful and remorseful for her actions and past choices, but also very positive, having strong intention of further self-improvement, rectification and is well equipped as a contributing member of society. While we understand there is a natural consequence to every action, continuing to remain incarcerated is preventing her from reaching her intended potential and from sharing her experience, strength, hope and faith to her community and beyond. It is my professional opinion that Ms. Miller has the internal discipline to be a productive and successful member of society when she is released. I would not hesitate to welcome her as a member of my community. I believe she deserves every consideration and hope that consideration will result in her being returned to her family and community at the earliest date possible.

Sincerely,

C. Lopez
Case Manager
Federal Bureau of Prisons

President Donald Trump
1600 Pennsylvania Ave NW
Washington, D.C. 20500

Dear President Trump,

My name is Johnny Davis and I am a federal employee as the Director of Logistics for the Central Alabama Veterans Healthcare service. My Daughter, Adrianne Miller #15437002, is an inmate at Camp Colman, Florida. She is serving a sentence of 15 years for drug charges.

I am writing a letter of clemency for my Daughter because I feel she has served her time to date with good behavior and understands what her imprisonment is for and what she needs to do to change her life to become a better person and citizen. She is remorseful for her actions and has spent time working in a positive manner for both herself and helping others in programs she has volunteered for during her imprisonment.

Adrianne was a drug addict for quite a few years and the habit has created problems for her both physically and personally. While doing her time in the federal penitentiary she has learned to cope with situations because of her training and counseling she has received through that program. I feel sure she has not only rehabbed but understands the cost of freedom and how to deal with adversity like most people do to ensure she keeps her freedom.

The state and local laws allow for an inmate to work to better themselves, offers the rehab, and other self-improvement opportunities to be released at an earlier date and become productive citizens. The federal system offers the same thing except for the early release. Since she has been a model inmate and taken advantage of the program opportunities I am asking for early release considerations for my Daughter with this request for clemency.

If the above would happen I can only guarantee that she will have family commitment and support for her next journey. I truly believe she can be a better person and help others because of her past journey.

My sincerest thank you for your considerations,

*Johnny Davis*

President Donald J. Trump

1600 Pennsylvania Ave. NW

Washington, D.C. 20500


Re: Clemency Petition for Adrianne Miller #15437002MILLER


Dear President Trump,

My name is Cynthia Davis, my daughter is Adrianne Davis Miller an inmate at the FCC Coleman Camp in Coleman Florida for women. She is currently serving a 15-year sentence for a non-violent drug charge.

My daughter is a recovering Meth addict, she has made a lot of mistakes and she has and is paying for them in many ways.

She admits that she deserves to do time for the mistakes that she made in the past and is willing to do what is right to prove to herself and everyone else that she is truly sorry for the mistakes. She has asked for forgiveness in many ways first from God and family and society.

Adrianne is a recovering addict and will work the rest of her life to remain clean and to help other addicts to become clean and remain clean as well. Her goal when she is released is to help other addicts to give back to all that have helped her.

Adrianne has a huge, kind, good & loving heart.... She has come to terms with her past and has changed her way of thinking in so many ways that are all positive to keep herself focused and determined and ultimately happy and clean forever.

Please consider my daughter for clemency she deserves a fair chance to prove to you, her family and society that she can and will be a model citizen and give to society.


Thank You for your consideration.

Cynthia Davis

727 Whitehall Pkwy

Montgomery, Al. 36109



Margaret Anne Davis
334-300-5471

3211 Pinewood Circle
Lillian, AL 36549

President Donald Trump
1600 Pennsylvania Ave NW
Washington, D.C. 20500

RE: Clemency Petition for Adrianne Miller #15437002; Case No. C275334

Dear President Trump,

My name is Margaret Anne Davis and I am Adrianne Miller's stepmother. I met Adrianne when she was 11 years old and pray I have been a positive influence in her life.

Drug addiction is a disease that has affected Adrianne's life negatively. As an addict, she has made choices I believe she would not have made otherwise. Adrianne admits and understands that her choices have affected her and the lives of her family negatively. She understands the consequences of her actions. She has learned a lot about herself in the extensive *Residential Life Connection Program or LCP* that she _successfully completed April 19, 2018(pictured below)_. The program has given her skills on how to successfully cope with everyday stresses. She has earned 50+ certificates in completed programs and is currently in cosmetology school at FCI Coleman, Fl. She is scheduled to complete the program in May 2020. Adrianne is on Amy Povah CAN-DO top 25 list.

As Adrianne's step mother, I have watched what drug addiction can do to a straight A student and cheerleader with exceptional work ethics. 15 years in a Federal Prison is an absurd sentence for her **non-violent** drug offense that includes a *gun enhancement* even though she never had a gun! #federallawsmustbechanged! Adrianne has worked hard while in prison to prove herself even though she is reminded daily that her choices put her there. She is an addict not a criminal. An addict who needs the love and the support of her family. I pray that you can see she deserves to be reunited with her family, friends and society.

Thank you for your time and consideration,

*Margaret Anne Davis*





United States Department of Justice
Federal Bureau of Prisons
Federal Medical center-Carswell
P.O. BOX 27066, J Street, Building 3000
Fort worth, TX 76127
Tel: 817-278-4000

11/20/2017

To Whom It May Concern:

I am honored to introduce our religious services worker, MILLER, ADRIANNE Reg # 15437-002 who has worked with us for several months in the religious department at FMC Carswell, TX. She has showed herself to be a very dedicated, sincere and hard working person. She has always completed the work she was asked to do and went beyond our expectations. She has proven herself to be an excellent Worker, a good Mentor for the inmates, a good organizer, self- motivated, honest, trustworthy, reliable, respectful, and courteous person. We would gladly give her a job again and again if the opportunity arose. It is worthy to be mentioned that Ms. MILLER could be a great asset as an employee/Worker for any religious or non-religious institutions and departments.

As a chaplain, I provided few sessions of counseling to Ms.MILLER and I found her to be very regretful for the past but very positive, having strong intention of further self-improvement, rectification and positive contribution to the outside society.

According to her promises and positive intention, I pray that she further improves herself and abides by rules regulations and law of the country.

I pray that GOD bless her and wish her all the best in whatever she does and where ever she goes.

Dr. FARID FAROOQI (MD, DVM
        Staff chaplain
U.S. Department of justice
Federal Bureau of Prisons
        FMC Carswell
Building 3000, "J "Street
Fort Worth, TX 76127
Tel: 817-782-4362 FMC

Chaplain Casey J. Campbell, DMin
Federal Medical Center, Carswell
Department of Religious Services
Fort Worth, TX 76127

July 5, 2018

To Whom It May Concern,

I am writing this letter with regard to a request for commutation being made by Ms. Adrianne Miller. It is my strong belief that she has worked hard for the right for her case to be carefully considered, and that justice would be served by a reconsideration of the length of her sentence. It is my understanding that Ms. Miller's criminal activity was directly related to her drug addiction, and I am hopeful that she will sooner be given an opportunity (outside of the confines of an institution) to continue to prove that she has recovered from that addiction.

I have worked with Ms. Miller for several years now, and I believe that she is sincerely repentant and has every intention of being a productive citizen upon her release from custody. I recognize that the structure of institutional life may create an artificial level of discipline for a recovering addict, and that there is no way to know for certain how he or she may respond when that artifice is lifted. It is my professional opinion, however, that Ms. Miller has the internal discipline to be successful when she is eventually released.

I would not hesitate to welcome Ms. Miller as a member of my church, as a co-worker, and/or as my next-door neighbor. I believe that she deserves every consideration for a shorter sentence, and hope that consideration will result her being returned to her family and community sooner rather than later. This is a hope that I believe I share with all of my colleagues in the department of Religious Services.

Sincerely,

Casey J. Campbell

March 28, 2020
11245 Hwy 80W
Shorter, AL 36075


President Donald Trump
1600 Pennsylvania Ave NW
Washington, D.C. 20500


RE: Clemency Petition for Adrianne Miller #15437002

Dear President Trump,

Adrianne Miller is my niece. She is currently incarcerated in the Federal Prison system on 15 year sentence for a non-violent drug related charge.

Although Adrianne has struggled with addiction throughout her life and fully realizes the negative impact her addiction has had on our family, Adrianne has worked hard to complete several intensive educational programs while in the prison system. She has gained insights and skill needed to live a sober and productive life, and shows a sincere desire to both make amends to her loved ones and fight against the disease of her addiction.

Adrianne has strong support from her family. She is in daily contact with us through a texting system allowed in her facility. Her communications are positive and uplifting, never self-seeking. I have participated in multiple video chat sessions over the past years. She is an active and integrated member of our family despite her incarceration. Adrianne and I have also kept up a written correspondence over the last three years. This exchange of letters has helped me get to know Adrianne as a reflective and resilient  person. If released, Adrianne will be surrounded by a family support network.

Adrianne is shown herself to be diligent and hardworking. She has sought to understand her mistakes, and is devoted to continued growth. Society would be better served if this young woman was released.

I hope you will consider Adrianne Miller's request for clemency.

Sincerely,



Elizabeth Harber

Cc: Jared Kushner

June 13, 2018

President Donald Trump
1600 Pennsylvania Ave NW
Washington, D.C. 20500

RE: Clemency Petition for Adrianne Miller #15437002

Dear President Trump,

My Name is Rebecca Davis and I am a close friend of Adrianne Miller. I have known Adrianne for over 15 years. She and I have stayed in touch through the good and the bad. She is currently serving a 15-year sentence in a federal institution for a **non-violent** drug charge. So far, she has served three years of said sentence. While we understand there is a consequence to every action, continuing to remain incarcerated is preventing her from reaching her intended potential and from sharing her experience, strength, and hope to her community and beyond. She has an opportunity to change the world by giving hope to the hopeless.

Adrianne has a strong support system of family and friends who have been helping her along this journey and will continue to do so. Before this, she held a stable job for ten years and was married. After her divorce is when her addiction re-surfaced and she was soon after convicted on this drug conspiracy charge. She has learned the lesson that was intended, and her life has been forever altered. Adrianne has discovered so much about herself in the Residential Life Connection Program she recently graduated. As a woman who has been in a similar situation, I know how much one's life can change for the good and I have been able to help others change their lives, which is an indescribable feeling. Adrianne needs the same chance to stand in her truth and to tell the world her story and how she over-came the obstacles thrown her way. She has re-named and reclaimed her life, she is a true example of rehabilitation. It is quite amazing when two people share authentically with one another, miraculous things happen. Given this opportunity, she will be able to right her wrongs by helping other drug addicts see the truth, opening the door to endless possibilities.

Thank you for your time and let's change the world together.

Sincerely,



Rebecca Davis
124 Moores Spring Road
Montevallo, AL 35115
334-434-9771

CC: Jared Kushner

On behalf of Adrianne Miller

Hello,


My name is Tanja Nichols and Adrienne Miller is my neice.  I'm writing to advocate a sentence reduction for her.  Since she has been incarcerated in Ft. Wort. TX I have been able to visit with her on a regular basis.  It's been both my pleasure and a blessing to see how far this young woman has come. Has she done wrong, yes.  Was she a drug addict, yes.  More importantly, what has she learned?  She has learned that life is about family, friends and loved ones -and giving back.  Giving back not only to those who have helped you through your struggles but those who you haven't  even met yet.

"A" as her family likes to call her, has a strong desire and need to to make up for all the pain and heartache she has brought to herself and her family.  She doesn't see herself as a vicitim, or blame others for the mistakes/choices she has made.  She is accountable for those mistakes and she wants to help others in their struggles and life choices.  A long term prison sentence is not where she can be a valuable citizen or contributor to society.

Please consider a sentenace reduction for my neice, "A" ...she acknowledges her mistakes and is ready to repay her debt by living a life of service for others.

Thank you for your consideration.

Tanja Nichols

2 Fresh Meadow Court

Trophy Club, TX 76262

November 6, 2019

President Donald Trump
1600 Pennsylvania Ave NW
Washington DC 20500

RE: Clemency Petition for Adrianne Miller 15437-002

Dear President Trump,

My name is Connie Campbell and I am a very good friend of Adrianne Miller 15437-002, currently incarcerated at the Federal Correctional Complex Camp in Coleman FL, serving a 15 year sentence for a Non-Violent drug offense **that includes a gun enhancement even though she <u>never</u> had a gun.** Adrianne has maintained clear conduct throughout her incarceration. She has taken and continues to take, full advantage of the programs the BOP has to offer and has numerous certificates to show for her many accomplishments. She has been an exemplary student and spends her time in a positive manner helping herself as well as others. It's time to bring her home, Mr. President, so she can share her story with the world and continue on her journey to helping & educating those in need just as she once was.

Thank you in advance for your time. Together we can Make America Great Again!

Sincerely,

Connie Campbell
4335 Aegean Drive
Apt 244A
Tampa FL 33611
813-857-1188


**CC: Jared Kushner**



## Davis, Cynthia

| | |
|---|---|
| **From:** | jo <ojbmorgan@oaksofjustice.us> |
| **Sent:** | Tuesday, July 23, 2019 4:29 PM |
| **To:** | Cynthia Davis; Davis, Cynthia |
| **Subject:** | Fwd: Adrianne Davis Miller Reg.No.15437-002 Case No.C275334 |

---------- Forwarded message ---------
From: **chad davidson** <thechadd005@gmail.com>
Date: Tue, Jul 23, 2019 at 1:19 PM
Subject: Adrianne Davis Miller Reg.No.15437-002 Case No.C275334
To: <ojbmorgan@oaksofjustice.us>

I am writing you on behalf of Adrianne Davis Miller.I believe Adrianne is truly deserving of a reduction to her sentence. She has served time without any issues and has completed several  programs and courses. She can be a valuable asset to society if given the opportunity.I believe people learn so much more from others who have gone thru the same experiences as themselves. She would be an amazing example to people that drug addiction can be beaten. She just may be able to save a life or at the minimum help them from ending up in prison.In closing, please take a look at Adriannes case. She has served enough time and is so ready to get back out in the world and start making a real difference in peoples lives.

--
Thanks,
Chad Davidson

--
BE BEST
Jo
Oaks of Justice.
814 205 1214

1

DATE REVIEWED: _____

INSTITUTION:    Coleman Camp _____    UNIT/ CSW:    F09-312U / F3 _____

INMATE NAME:    MILLER,ADRIANNEDAVIS    REG NO:    15437-002 _____

FIRST STEP ACT (Circle One):    (ELIGIBLE)    /    INELIGIBLE

RECIDIVISM RISK LEVEL (Circle One):    MINIMUM    (LOW)    MEDIUM    HIGH

REGNO: 15437-002     NAME:  MILLER, ADRIANNE DAVIS
FRP ASGN: COMPLT          DATE OF MOST RECENT PAYMENT:  05-26-2015

----------------------MOST RECENT PLAN INFORMATION------------------------
NUMBER: 1                  DATE ADDED: 05-26-2015  BY:  ALI
STATUS: STOPPED          REASON STOPPED: DCSNS STPD

--------------------------MOST RECENT PAYMENT PLAN--------------------------

INMATE DECISION: AGREED          25.00          MONTHLY          TRUST FUND
ANTICIPATED START:  07-2015     ACTUAL START:  07-2015
REASON DECISION STOPPED: NOT PYABLE
FOR THE FOLLOWING OBLIGATIONS:
          1
--------------------------ALL FINANCIAL OBLIGATIONS--------------------------

| OBLIGATION NBR TYPE | AMOUNT IMPOSED | BALANCE | PAYABLE | STATUS |
|---|---|---|---|---|
| 1 ASSMT | 200.00 | 0.00 | IMMEDIATE | COMPLETEDZ |

G0000     TRANSACTION SUCCESSFULLY COMPLETED

```
REGISTER NO: 15437-002      NAME..: MILLER              FUNC: PRT
FORMAT.....: TRANSCRIPT      RSP OF: COL-COLEMAN LOW FCI
```

--------------------------- EDUCATION INFORMATION ---------------------------

| FACL | ASSIGNMENT | DESCRIPTION | START DATE/TIME | STOP DATE/TIME |
|------|-----------|-------------|-----------------|----------------|
| COL | ESL HAS | ENGLISH PROFICIENT | 06-23-2015 1832 | CURRENT |
| COL | GED HAS | COMPLETED GED OR HS DIPLOMA | 06-23-2015 1832 | CURRENT |

--------------------------- EDUCATION COURSES ---------------------------

| SUB-FACL | DESCRIPTION | START DATE | STOP DATE | EVNT | AC | LV | HRS |
|----------|-------------|------------|-----------|------|----|----|----|
| COL SCP | CAMP VT COSMETOLOGY PROGRAM | 05-22-2019 | CURRENT | | | | |
| COM SCP | CAMP VT COSMETOLOGY PROGRAM | 05-22-2019 | 10-01-2019 | C | W | I | 0 |
| COM SCP | RE-ENTRY | 08-15-2019 | 08-15-2019 | P | C | P | 2 |
| CRW LOW | GUITAR CLASS HOSPITAL | 08-02-2018 | 09-20-2018 | P | C | P | 8 |
| CRW LOW | FEM OFF: ACCESS | 08-17-2017 | 11-07-2017 | P | C | P | 10 |
| CRW LOW | FEM OFF: FOUNDATION | 08-08-2017 | 10-12-2017 | P | C | P | 15 |
| CRW LOW | RPP6 MOTIVATE OTHERS | 09-06-2017 | 10-11-2017 | P | C | P | 6 |
| CRW LOW | EXTREME WEATHER | 10-04-2016 | 11-08-2016 | P | C | P | 6 |
| CRW LOW | FUN CRAFT CLASS RECREATION | 10-01-2016 | 10-22-2016 | P | C | P | 4 |
| CRW LOW | LIFE ETERNAL CLONES | 09-15-2016 | 09-15-2016 | P | C | P | 2 |
| ALI | US HISTORY FCI | 08-02-2016 | 08-30-2016 | P | C | P | 10 |
| ALI | NATIVE AMERICAN HISTORY | 05-24-2016 | 06-21-2016 | P | C | P | 10 |
| ALI | REENTRY SISTA PROG-MON 12-4 EJ | 05-09-2016 | 06-07-2016 | P | C | P | 8 |
| ALI | PARENTING WORKSHOP | 05-04-2016 | 05-04-2016 | P | C | P | 2 |
| ALI | ELECTRONIC LAW LIBRARY-FCI | 03-29-2016 | 05-03-2016 | P | C | P | 10 |
| ALI | CROCHET PRIMARY CLASS FCI | 01-08-2016 | 02-26-2016 | P | W | I | 4 |
| ALI | LIFE MGMT SKILLS II FCI | 01-03-2016 | 02-21-2016 | P | W | I | 10 |
| ALI | PUBLIC SPEAKING-FCI | 11-19-2015 | 12-22-2015 | P | C | P | 10 |
| ALI | PARENTING FROM WITHIN FCI | 10-20-2015 | 10-29-2015 | P | C | P | 40 |
| ALI | SUICIDE PREV.WKSHP MON 8-11 EJ | 11-20-2015 | 11-23-2015 | P | C | P | 3 |
| ALI | SIGN LANGUAGE | 09-30-2015 | 11-18-2015 | P | C | P | 16 |
| ALI | LIFE MANAGEMENT SKILLS I | 09-26-2015 | 11-15-2015 | P | C | P | 15 |
| ALI | SELF ESTEEM FCI | 09-16-2015 | 10-14-2015 | P | C | P | 10 |
| ALI | HEALTH AWARENESS CAMP | 04-13-2015 | 09-10-2015 | P | C | P | 20 |

--------------------------- HIGH TEST SCORES ---------------------------

| TEST | SUBTEST | SCORE | TEST DATE | TEST FACL | FORM | STATE |
|------|---------|-------|-----------|-----------|------|-------|
| TABE D | LANGUAGE | 10.7 | 05-21-2019 | COM | 10 | |
| | MATH APPL | 8.2 | 05-23-2019 | COM | 9 | |
| | MATH COMP | 8.4 | 05-23-2019 | COM | 9 | |
| | READING | 12.9 | 05-21-2019 | COM | 10 | |

G0000      TRANSACTION SUCCESSFULLY COMPLETED

EXHIBIT D

**Federal Public & Community Defenders**
**Legislative Committee**

52 Duane Street, 10ᵗʰ Floor
New York, NY 1007
Tel: (212) 417-8738

Co-Chairs

David Patton
Executive Director
Federal Defenders of New York

Jon Sands
Federal Defender
District of Arizona

May 11, 2020

The Honorable Mitch McConnell
Majority Leader
United States Senate
Washington, DC 20150

The Honorable Charles Schumer
Minority Leader
United States Senate
Washington, DC 20501

The Honorable Nancy Pelosi
Speaker
United States House of Representatives
Washington, DC 20515

The Honorable Kevin McCarthy
Minority Leader
United States House of Representatives
Washington, DC 20151

Dear Members of Congress:

We are grateful for the continued interest in the views of the Federal Public and Community Defenders ("Federal Defenders") by Congress during the COVID-19 crisis. Federal Defenders and other counsel appointed under the Criminal Justice Act represent 90 percent of all federal defendants. We write because vulnerable individuals in federal detention need your help to protect them from serious illness or death. The following measures would provide badly needed relief:

- A presumption of release under the Bail Reform Act, absent clear and convincing evidence that a person poses a specific threat of violence;

- Broader tools to enable courts to release or transfer—even temporarily—individuals already sentenced, including broader authority to modify existing sentences, grant furloughs, and grant compassionate release; and

- Ongoing, universal testing for all incarcerated individuals and staff, including at private-contract facilities.

We are grateful that on March 27, 2020, Congress unanimously passed the CARES Act, which authorized Attorney General (AG) William P. Barr to expand dramatically the use of home confinement to protect vulnerable individuals from COVID-19.[1] This measure recognized the public-health consensus that reducing the population of prisons and jails is the only way to avert a

---

[1] *See Coronavirus Aid, Relief, and Economic Security Act*, H.R. 748 § 6002 at Div. B, Tit. II, Sec. 12003(b)(2)(2020) ("CARES Act").

1

humanitarian crisis.[2] But despite promises to take "aggressive"[3] action and "move with dispatch"[4] to stop the spread of COVID-19, the Department of Justice (DOJ) and the Federal Bureau of Prisons (BOP) have made little use of these authorities to reduce prison populations and enable social distancing. Nor have they developed a coherent strategy to protect those in their care or employ.

The death of 30-year-old Andrea Circle Bear on April 28, 2020—four weeks after giving birth to her daughter while on a ventilator—is emblematic of the tragedy unfolding under AG Barr's watch.[5] On March 20, 2020, Ms. Circle Bear was several months into a two-year sentence for a low-level drug offense, when the United States Marshals transported her from Winner City Jail in South Dakota to FMC Carswell in Texas via its notoriously harsh transport system.[6] She was also in the eighth month of a high-risk pregnancy. Eleven days later she began exhibiting severe symptoms of COVID-19 and was taken to a local hospital where she was placed on a ventilator. The next day her baby was born by emergency cesarean section. Less than a month later, Ms. Circle Bear died from COVID-19.

As Senator Richard Durbin concluded: "Simply put, this tragic death was preventable."[7] At every turn, DOJ and BOP made choices that contributed to Ms. Circle Bear's death and put her unborn child at risk. BOP was aware that she was at extremely high risk of death if she contracted COVID-19 because of her medical condition and late term pregnancy. Yet they did nothing to ameliorate that risk; indeed, they exacerbated it. If BOP was making responsible use of its authority to release people, Ms. Circle Bear would not have been in custody—much less transferred a thousand miles away in a manner that did not protect her from contracting a fatal disease.

DOJ and BOP's failures also endangered staff and the surrounding community. The President of the FMC Carswell correctional officer union wrote Senator John Cornyn on April 7, 2020, to blow the whistle on BOP. She reported that seven staff members had contact with Ms. Circle Bear while she was symptomatic, but before test results confirmed she had COVID-19.[8] The staff had "not

[2] *See* Letter from David Patton, *et al.*, to Hon. William P. Barr at 5-6 (Apr. 1, 2020) ("April 1 Federal Defender Letter"), https://bit.ly/35NBGZy; *see also* Letter from David Patton, *et al.*, to Hon. William P. Barr at 1 ("Mar. 19 Federal Defender Letter"), https://bit.ly/35NdSW4.

[3] Bureau of Prisons, *Update on COVID-19 and Home Confinement* (Apr. 5, 2020), https://bit.ly/2WGxM0v ("April 5 BOP Guidance").

[4] Mem. from Hon. William P. Barr to Michael Carvajal, Director of the Bureau of Prisons at 1 (Apr. 3, 2020) ("April 3 AG Memo"), https://bit.ly/3ciP5eV.

[5] Nicholas Bogel-Burroughs & Vanessa Swales, *Prisoner With Coronavirus Dies After Giving Birth While on Ventilator*, N.Y. Times (Apr. 29, 2020), https://nyti.ms/3duihji.

[6] *See* Press Release, Bureau of Prisons, *Inmate Death at FMC Carswell* (Apr. 28, 2020) ("Inmate Death at FMC Carswell"), https://bit.ly/2L8SzVn; *see also* Michael Rothenberg, *The Federal Prisoner Transit System—aka 'Diesel Therapy'—Is Hell*, The Marshall Project (Aug. 15, 2019), https://bit.ly/2WiAMS1.

[7] *See* Press Release, Sen. Dick Durbin, *Statement on Death of First Female Federal Inmate Due to COVID-19* (Apr. 29, 2020), https://bit.ly/3fx9ZsF.

[8] *See* Letter from Regina Warren, President AFGE Local 1006 to Sen. John Cornyn (Apr. 7, 2020), https://bit.ly/2SNPMoR ("Whistleblower Complaint").

been given any guidance" about what personal protection equipment ("PPE") was available, the "process of getting [PPE]," or "when/how to use [PPE]."

This failure is no outlier. In just over a month, forty-eight individuals in BOP custody have died from COVID-19.[9] COVID-19 is tearing through BOP facilities; incarcerated individuals are being infected at a rate more than 6.5 times higher than in the United States.[10] Despite this, BOP has transferred less than 1.5 percent of the over 174,000 individuals in its custody[11] to the relative safety of home confinement. These cold numbers are proof of the government's abdication of its duty. That "moral and constitutional duty," House Judiciary Committee Chairman Jerry Nadler has explained, requires DOJ to "prevent additional deaths among those who are detained or imprisoned under our laws."[12]

Congress should not be fooled by DOJ and BOP's empty promises. Federal judges around the country have used unusually blunt terms to describe the government's behavior: "an outrage,"[13] "deliberate indifference,"[14] "Kafkaesque,"[15] "illogical,"[16] "alarming,"[17] "unfathomable,"[18] "offends the Court,"[19] and "shocking[]."[20]

A court-ordered inspection and evaluation last week of the Metropolitan Detention Center (MDC) in Brooklyn, the largest pretrial BOP facility in the country, laid bare DOJ and BOP's false claims about their response to COVID-19.[21] The former Chief Medical Officer of New York City's

---

[9] Bureau of Prisons, *COVID-19 Coronavirus Page* (last visited May 10, 2020), https://bit.ly/2SOsQpe ("BOP COVID-19 Website").

[10] Federal Defenders of New York, *BOP-Reported Positive Tests for COVID-19 Nationwide* (last visited May 11, 2020), https://federaldefendersny.org/.

[11] *See* Joseph Neff & Keri Blakinger, *Few Federal Prisoners Released Under COVID-19 Emergency Policies*, The Marshall Project (Apr. 25, 2020), https://bit.ly/2LbOTCj ("Few Federal Prisoners Released") (reporting individuals in BOP custody at the beginning of April); BOP COVID-19 Website (last visited May 10, 2020) (2,428 inmates are on home confinement).

[12] *See* Judiciary Committee-Democrats, Facebook (Apr. 30, 2:30 PM), https://bit.ly/2LpR45n.

[13] *See* Stewart Bishop, *NY Judge Rips 'Terrible' Conditions at NYC Federal Jails*, Law360 (May 5, 2020), https://bit.ly/2WkV3GC.

[14] *Wilson v. Williams*, ---F.Supp.3d---, 2020 WL 1940882, at *8 (N.D. Ohio Apr. 22, 2020), *appeal filed*, No. 20-3447, 2020 WL 2120814 (6th Cir. Apr. 27, 2020).

[15] *United States v. Separta*, ---F. Supp. 3d---, 2020 WL 1910481, at *1 (S.D.N.Y. Apr. 20, 2020).

[16] *Casey v. United States*, No. 4:18-cr-4, 2020 WL 2297184, at *2 (E.D. Va. May 6, 2020).

[17] *United States v. Rodriguez*, ---F.Supp.3d---, 2020 WL 1627331, at *9 (E.D. Pa. Apr. 1, 2020).

[18] *See United States v. McIndoo*, ---F.Supp.3d---, 2020 WL 2201970, at *8 (W.D.N.Y. May 6, 2020).

[19] *United States v. Amarrah*, No. 17-cr-20464, 2020 WL 2220008 (E.D. Mich. May 7, 2020).

[20] *United States v. Reid*, No. 17-cr-00175, 2020 WL 1904598, at *3 (N.D. Ca., Apr. 18, 2020).

[21] Facility Evaluation: Metropolitan Detention Center COVID-19 Response, *Chunn v. Edge*, No. 1:20-cv-01590 (E.D.N.Y. Apr. 30, 2020).

Correctional Health Services wrote in his report he was "alarmed by the facility's failure to implement simple procedures" consistent with Centers for Disease Control and Prevention ("CDC") guidelines, and he concluded there were "multiple systemic failures" that placed incarcerated individuals and staff at grave risk.[22] In response, the MDC has changed nothing.

Federal correctional officers everywhere are speaking out in the press,[23] a national lawsuit,[24] and by filing complaints with the U.S. Occupational Safety and Health Administration ("OSHA") about insufficient PPE, non-existent social distancing, and other deviations from CDC guidance.[25]

Under AG Barr's watch, DOJ and BOP have ignored Congressional oversight,[26] court directives,[27] and whistleblowers.[28] DOJ and BOP have failed to fulfill their obligations to the American people, or to use the powers that Congress has given them. We urge Congress to take immediate and decisive action that does not rely on DOJ or BOP's discretion.

Congress need not throw the prison gates open. It need only provide a simple, safe, and achievable solution: responsible releases, robust testing and reporting to identify COVID-19, and adequate procedures to prevent the spread of the virus among incarcerated individuals, staff, and their communities.

## I.     DOJ is Obstructing Responsible Release.

We have twice written AG Barr to urge him to use "existing authority to take immediate and decisive action to both reduce the number of people entering federal detention and release individuals who are already incarcerated," by: 1) suspending new arrests and reducing pretrial detention; 2) accelerating and expanding transfers to community and home confinement; and, 3)

---

[22] *Id.* ¶¶ 1, 2.

[23] *See, e.g.,* Keith L. Alexander & Dan Morse, *As Virus Spreads in Jails and Prisons, Correctional Officers Fear for Themselves and their Loved Ones,* Wash. Post (May 4, 2020), https://wapo.st/3bec9Ks; Luke Barr, *Over 5,000 Corrections Officers Have Contracted Covid-19,* ABC News (May 5, 2020), https://abcn.ws/2zlB8hG ("5,000 Corrections Officers Have Contracted Covid-19").

[24] *See, e.g.,* Complaint, *Braswell v. United* States, No. 20-cv-359, ECF No. 1 (U.S. Ct. Fed. Claims, Mar. 27, 2020), https://bit.ly/2WmaQVz.

[25] *See, e.g.,* NACDL, *NACDL – 03-31-2020 OSHA Complaint re BOP brought by Council of Prison Locals 33 Union,* https://bit.ly/35Lcu5W (last visited May 3, 2020) ("National OSHA Compl."); James Call, *Correctional Officers File Complaint about Coronavirus at Federal Prison in Tallahassee,* Tallahassee Democrat (Apr. 18, 2020), https://bit.ly/3drQlfD ("Correctional Officers File Complaint").

[26] *See* April 1 Federal Defender Letter at 2 n.6; *see also* Letter from Hon. Jerrold Nadler & Hon. Karen Bass, to Hon. William P. Barr at 2 (Apr. 10, 2020), https://bit.ly/2yy5nSy ("April 10 House Judiciary Letter"); Letter from Sen. Richard J. Durbin & Chuck Grassley, to Hon. William P. Barr (Apr. 21, 2020), https://bit.ly/2WhCvqM ("Senate IG Letter").

[27] *See* Respondent's Status Report, *Wilson v. Williams,* No. 4:20-cv-794, ECF No. 49 (N.D. Oh. May 6, 2020) (BOP refusal to consider vulnerable individuals incarcerated at Elkton for furlough, despite court order to do so) ("Elkton BOP Status Report").

[28] *See, supra,* n. 23-25; *see also Whistleblower Complaint.*

expanding the use of compassionate release.[29] Members of Congress have likewise pressed AG Barr and BOP Director Carvajal to "be as expansive as you can be regarding release.[30] Neither has heeded these calls.

**Release under the Bail Reform Act.** In a memo dated April 6, 2020, AG Barr sent mixed signals to federal prosecutors on when to seek pretrial detention during the COVID-19 pandemic. Though he acknowledged the risk of detaining vulnerable individuals with underlying health conditions, in the same breath, he directed prosecutors to remain "faithful" to the Bail Reform Act and their "duty to protect the public . . . from contagion spread by someone released from our custody."[31] In short: if you are unlucky enough to be exposed to COVID-19 at your detention facility, the government will oppose your release. Unsurprisingly, and in contrast with numerous state and local jurisdictions,[32] DOJ continues to routinely oppose release, even in cases where the defendants have serious, undisputed medical conditions. In one jurisdiction, the government has agreed to release in only 8 out of 125 cases since March 16, 2020, where release was sought under the Bail Reform Act. Because of the grave risk to the individuals the government is fighting to keep detained, the danger of increasing—rather than lowering—prison populations and the data showing that higher release rates do not lead to more crime or flight,[33] Congress should act to impose a presumption of release under the Bail Reform Act, absent clear and convincing evidence that the individual poses a specific threat of violence.

**Transfer to Home Confinement.** The CARES Act authorized AG Barr to expand dramatically the use of home confinement to protect vulnerable individuals from COVID-19.[34] But rather than act swiftly, DOJ and BOP have issued guidance and memos,[35] each "more confusing than the next,"[36] that together establish a "complex set of procedural and logistical hurdles to home confinement."[37]

---

[29] *See* Mar. 19 Federal Defender Letter; April 1 Federal Defender Letter.

[30] April 10 House Judiciary Letter.

[31] Mem. from the Attorney General, *Litigating Pre-Trial Detention Issues During the COVID-19 Pandemic* (Apr. 6, 2020), https://bit.ly/2zqMGzY ("April 6 AG Memo").

[32] March 19 Federal Defender Letter at 3 n. 8.

[33] *Id.* at 4 n. 10.

[34] *See* CARES Act § 6002 at Div. B, Tit. II, Sec. 12003(b)(2).

[35] *See* March 26 AG Memo; April 3 AG Memo; April 6 AG Memo; *see also* Apr. 22 BOP Memo; Bureau of Prisons, *Frequently Asked Questions Regarding Potential Inmate Home Confinement in Response to the COVID-19 Pandemic* (archived Apr. 18, 2020), https://bit.ly/2yKLkjN; April 5 BOP Guidance; Mem. from David Brewer, BOP Acting Senior Deputy Assistant Director, *Furlough and Home Confinement Additional Guidance* (undated) (archived on April 16, 2020), https://bit.ly/3dujxCJ.

[36] *See* Holly Harris, *Opinion: Blame the Justice Dep't for Andrea Circle Bear's Death*, N.Y. Times (May 3, 2020), https://nyti.ms/2yyeNxp.

[37] April 1 AG Memo at 2.

Altogether, the guidance is "muddled and arbitrary, bearing little connection to the enormity of the crisis or threat to public safety."[38]

*Confused standards.* The byzantine criteria in these often contradictory memos have caused chaos and uncertainty within BOP and DOJ. For example, nearly a month after AG Barr's first memo, the government could not explain the program in response to a federal court, citing "ongoing uncertainty surrounding the home-confinement eligibility criteria."[39] That court ultimately ordered the defendant's immediate release: "in light of [DOJ's and BOP's] ever-changing guidelines," the court could "not allow" the defendant to be "endangered for one more day" in BOP custody.[40] Confused and contradictory standards have cruelly resulted in situations where families, informed that a loved one will be transferred to the relative safety of home, are turned away when they arrive at prison gates, and told their loved one is no longer eligible for home confinement.[41]

We are also concerned that these confused standards will disproportionately harm racial and ethnic minorities. On April 28, 2020, Senator Amy Klobuchar and Senator Dick Durbin, joined by fifteen other senators, wrote to Director Carvajal to "urge the [BOP] to release critical demographic data" in light of "preliminary data that has shown COVID-19's disproportionate impact on certain populations, including racial and ethnic minorities."[42] In our April 1 letter to AG Barr, we also warned that arbitrary release policies could have a racially disparate impact.[43] It is critical that BOP heed these calls, and promptly release demographic data to ensure racial fairness.

*Failure to act.* Certain data—produced by BOP in civil litigation—confirms that the government has not effectively reduced prison populations. For example, an Ohio court recently ordered BOP to identify immediately the most vulnerable individuals incarcerated at Elkton Federal Correctional Institution—one prison hardest hit by the COVID-19 crisis—and to then evaluate each individual's eligibility for transfer.[44] Two weeks later, BOP admitted that it had moved none of the 837 identified high-risk individuals into home confinement; only five were "pending" placement"; 72 were "being

---

[38] *See* Lisa Freeland, David Patton & Jon Sands, *We'll See Many More Covid-19 Deaths in Prisons if Barr and Congress Don't Act Now*, Wash. Post (Apr. 6, 2020), https://wapo.st/2WFtSoN.

[39] *See* Letter filing by United States Attorney for the S.D.N.Y, *United States v. Haena Park*, 16-cr-473, ECF No. 72 (S.D.N.Y. Apr. 24, 2020).

[40] *United States v. Park*, No. 16-CR-473 (RA), 2020 WL 1970603, at *5 (S.D.N.Y. Apr. 24, 2020).

[41] *See* Neena Satija and Matt Zapotosky, *Amid Coronavirus Pandemic, Federal Inmates Get Mixed Signals About Home-Confinement Releases*, Wash. Post (Apr. 24, 2020), https://wapo.st/3c4TvWz; Joseph Neff and Keri Blackinger, *Few Federal Prisoners Released Under COVID-19 Emergency Policies*, The Marshall Project (Apr. 25, 2020), https://bit.ly/2zdhqUZ; *see also* Decl. Dianthe Martinez Books, *Jerdine v. Barr*, 20-cv-00569, ECF No. 1-3 ¶ 26 (D. Ohio Apr. 26, 2020).

[42] Letter from Sen. Amy Klobuchar to Dir. Carvajal (Apr. 28, 2020), https://bit.ly/2YQGb4a.

[43] April 1 Defender Letter at 10.

[44] *See Wilson v. Williams*, ---F.Supp.3d----, 2020 WL 1940882, at *10 (N.D. Ohio Apr. 22, 2020).

further evaluated"; and the remainder—760 individuals—did not qualify.[45] Reports from other institutions repeat the same pattern.[46]

*Counterproductive quarantine.* Even if a person is identified as eligible for home confinement, BOP places them in further danger with its ill-conceived, pre-transfer, 14-day quarantine policy. This policy has needlessly exposed incarcerated persons, staff, and the community to infection. That is because BOP has adopted a "group quarantine" approach in which "many inmates . . . on the cusp of relief to home confinement" are "housed together in close quarters for at least 14 days." Individuals are not tested before being placed on quarantine, allowing the asymptomatic sick to infect the healthy.[47] A judge explained that "[t]his is an illogical and self-defeating policy . . . ungrounded in science, and a danger to both [the inmate] and the public health of the community."[48] Last week, Senators Durbin and Grassley met with AG Barr, who assured them that "it's possible for some low-risk inmates being released to serve a 14-day quarantine in home confinement instead of in prison."[49] There is no reason to believe these words will translate into action. AG Barr made the same promise on April 3,[50] but weeks later, his attorneys told a court that BOP "has not and will not" consider quarantine outside of BOP.[51]

Due to the failure of DOJ and BOP to use their authority to decrease the prison population through responsible transfers to home confinement, Congressional action is needed to provide courts with broader tools to order the release or transfer—even temporarily—of individuals already sentenced.

**Compassionate Release.** Despite repeated Congressional directives that DOJ use compassionate release expansively during this crisis,[52] BOP facilities have refused to accept or review compassionate release requests[53] and prosecutors have adopted a nearly default opposition to release.

---

[45] *See* Elkton BOP Status Report at 2.

[46] *See, e.g.,* Decl. of Juan Segovia, *Livas v. Myers,* 2:20-cv-422-TAD, ECF No. 8-1 (W.D. La. Apr. 10, 2020), https://bit.ly/2Lceyus (Warden's report that BOP had given FCI Oakdale a list of just 58 individuals (of 1,853) meeting the baseline criteria of release. As of April 10, 2020, only six were approved for release).

[47] *United States v. Scparta,* --- F. Supp. 3d ---, 2020 WL 1910481, at *3 (S.D.N.Y. Apr. 20, 2020).

[48] *Id.*

[49] Press Release, Sen. Chuck Grassley, *Grassley, Durbin Statement Following Phone Call with AG Regarding Federal Prison System Efforts to Combat COVID-19* (May 6, 2020), https://bit.ly/3coFBPk ("May 6 Grassley Press Release").

[50] April 3 AG Memo at 2.

[51] *See Scarpta,* 2020 WL 1910481, at *1 (FCI Butner).

[52] Defender April 1 letter at 9 n. 57.

[53] *See, e.g.,* Decl. Kenneth Cassidy, *Martinez-Brooks v. Easter,* No. 20-cv-0569, ECF No. 1 ¶¶ 18, 25 (Danbury) (Apr. 27, 2020), https://bit.ly/3dx7g0E ("Danbury Decl.").

Thanks to the First Step Act of 2018 ("FSA"),[54] defendants no longer must depend on BOP to initiate a motion for compassionate release. This change came after BOP allowed the compassionate release program to languish for decades.[55] Post-FSA, defendants may file a motion directly with the court after administrative exhaustion, or the lapse of 30 days from the warden's receipt of a request, whichever is earlier.[56] The waiting period, coupled with obstruction by prosecutors in the courts, have combined to prevent vulnerable defendants from obtaining critical relief during the COVID-19 crisis. While 30 days may have seemed reasonable in normal times, such a delay is intolerable for a disease that can go from asymptomatic to fatal in less than a week.[57]

These hurdles to relief have become nearly insurmountable during the COVID-19 crisis. Certain facilities have inexplicably refused even to accept or consider requests for relief.[58] Just as before, BOP refuses to file motions on defendants' behalf: after a survey of the field, we are not aware of a single BOP-initiated motion for compassionate release during the crisis.[59] On the rare occasion that BOP responds to internal requests for compassionate release, it claims that COVID-19 vulnerability is not a sufficient basis for compassionate release.[60] BOP's recent report in the FCI Elkton litigation demonstrates its cramped view: of the 836 individuals at heightened risk identified by BOP, it claimed that only one "met the criteria" for compassionate release.[61]

BOP's obstruction has been compounded by DOJ's opposition to nearly all compassionate release motions during this crisis. DOJ argues that the situation in BOP facilities is under control, and that people's risk of contracting COVID-19 might *increase* if released.[62] The government has also disingenuously argued that compassionate release is unnecessary because of the promise of home

---

[54] First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239 (2018)(amending 18 U.S.C. § 3582(c)(1)(A)).

[55] *See, e.g.*, U.S. Dep't of Justice Office of the Inspector General, *The Federal Bureau of Prisons' Compassionate Release Program* (Apr. 2013), https://bit.ly/2YOMm99.

[56] 18 U.S.C. § 3582(c)(1)(A).

[57] *See* Cassidy McDonald, *Federal Prisons Confirm First Staff Death Linked to Coronavirus*, CBS News (Apr. 19, 2020) (describing USP Atlanta employee who died of COVID-19, after being tested, found asymptomatic, and cleared for entry to the facility less than a week earlier); *United States v. Gorai*, No. 218-CR-220, 2020 WL 1975372, at *2 (D. Nev. Apr. 24, 2020); *United States v. Gross*, No. 15-CR-769, 2020 WL 1673244, at *3 (S.D.N.Y. Apr. 6, 2020).

[58] *See, e.g.*, *United States v. Reid*, No. 17-cr-175, 2020 WL 1904598, at * 38 (N.D. Ca. Apr. 18, 2020); Order, *United States v. Tran*, 08-cr-197-DOC, ECF No. 405 (C.D. Cal. Apr. 10, 2020); Danbury Decl. ¶ 18, 25; Letter from Families Against Mandatory Minimums to AG Barr (Apr. 18, 2020), https://bit.ly/2WgAquU.

[59] Brief of Amici Curiae Ninth Circuit Federal and Community Defender Organizations in Support of Defender-Appellant, *United States v. Millage*, No. 20-30086, ECF No. 9-1, at 12 (9th Cir. Apr. 21, 2020).

[60] Warden Denial, *United States v. Petrossi*, 17-cr-192, SKT. 124-4 at Ex. D (M.D. Pa. Apr. 9, 2020).

[61] BOP Elkton Status Report at 3.

[62] *See* April 1 Letter at 6-7 n. 45; *see also* Gov't Opp. at 17, *United States v. Cortez-Zelaya*, No. 17-10192, ECF No. 71 (9th Cir. May 3, 2020); Gov't Resp. at 17-18, *United States v. Amarrah*, No. 5:17-cr-20464, ECF No. 194 (E.D. Mich. May 1, 2020); *United States v. Hammond*, No. 1:02-cr-294-BAH, ECF No. 51 (D.D.C. Apr. 16, 2020).

confinement, which rarely materializes.[63] We were pleased to see Senators Grassley's and Durbin's report that AG Barr had represented that "the COVID-19 pandemic will now be used as a basis for compassionate release."[64] But neither BOP nor AG Barr have given us reason to hope that this is anything but an empty promise.

Because of this fast-moving disease, defendants should be assured quick access to courts to assess the merits of their compassionate release claims. We ask Congress to suspend the procedural exhaustion and 30-day waiting provisions of 18 U.S.C. § 3582(c)(1)(A) during this pandemic.

## II.     DOJ is Failing to Mitigate the Spread of COVID-19 and is Obfuscating the Scope of the Crisis.

Any serious effort to combat COVID-19 requires social distancing, testing and isolation of cases, and PPE. The government's refusal to reduce prison populations has made social distancing impossible. Testing, isolation, and PPE are thus even more critical, so BOP can effectively triage outbreaks and protect the staff and incarcerated persons who must face these dangers every day. But BOP's testing is inadequate, and it appears to be incapable of providing sufficient PPE.

***Failure to Test.*** To hear it from DOJ and BOP, all is well and under control. In April, BOP Director Carvajal touted BOP's "remarkably low" rate of infection, claiming that "the low number of cases to this point, in a system this large, is a testament to our effective planning and execution-to-date."[65] In the 60 days since he made those remarks, the number of positive cases reported for staff and incarcerated individuals has ballooned to 4,552.[66] Despite this, BOP's message remains unchanged: Just last week, Director Carvajal boasted that "only 51 of our institutions—less than half—have been affected by COVID-19," and that "only 15 have an outbreak with more than 20 active lab-confirmed positive inmate cases."[67]

Congress should not place much faith in these representations, and Senators Dick Durbin and Chuck Grassley have asked the Inspector General to confirm their accuracy.[68] Testing at BOP facilities varies wildly, and any facility that self-reports zero cases may simply not be testing for this

---

[63] *See, e.g.*, *United States v. Park*, No. 16-CR-473, 2020 WL 1970603, at *5 (S.D.N.Y. Apr. 24, 2020).

[64] May 6 Grassley Press Release.

[65] Bureau of Prisons, *Statement from BOP Director: BOP Response to COVID-19 Pandemic* (Mar. 26, 2020), https://bit.ly/35L9Kpt.

[66] BOP COVID-19 Website (this number is a sum of *all* confirmed positive tests nationwide, including deaths, those with "active" confirmed positive test results, and those who have "recovered") (last visited May 11, 2020).

[67] *Dir. M.D. Carvajal Addresses All Staff*, 3:17 (May 6, 2020), https://bit.ly/2zlGvNM.

[68] *See* Letter from Sen. Durbin and Sen. Grassley to DOJ Insp. Gen. Horowitz 2-3 (Apr. 21, 2020), https://bit.ly/3cjEdgF.

virus.[69] In at least one facility, BOP has declared all inmates presumptively infected, stopped testing altogether, and has refused to release infection estimates.[70]

Nor has BOP implemented a systemic testing and isolation protocol for staff. A BOP spokesperson confirmed this, explaining that "staff are typically tested in the community."[71] There has been at least one report that BOP denied health and safety leave to a correctional officer after he tested positive for COVID-19, and instructed him to return to work if he was fever-free for 72 hours, with no testing to confirm whether he was still contagious.[72]

Even if the low rates of infection are accurate, they change quickly. Because of how quickly COVID-19 spreads in prison, facilities with zero cases can become deadly hotspots within a matter of days. On March 24th, Butner Medium FCI reported its first case. By April 14th, four incarcerated individuals had died and 46 were confirmed infected.[73] By May 9, 7 had died, and there had been 291 confirmed positive tests.[74] And, despite BOP's "precautions," the virus has now infected Butner's medical center, which houses extremely medically vulnerable inmates. On April 3, while the outbreak was worsening, the government opposed a motion for release from the facility, citing BOP's generic COVID-19 policies.[75] This pattern has repeated itself at FCI Terminal Island, Elkton, Oakdale, Fort Worth and the Metropolitan Correctional Center in Chicago.[76]

BOP cannot identify and isolate individuals infected with COVID-19 without large-scale testing.[77] Out of 2,700 tests conducted nationwide by the BOP, nearly 2,000 came back positive—roughly 70 percent.[78] Last week, the Council of Prison Locals (CPL) called on BOP to "immediately conduct mass testing of all employees and incarcerated people."[79] CPL warned that "[a]nything less than

---

[69] *See United States v. Asaro*, 2020 WL 1899221, at *3 (E.D.N.Y. Apr. 17, 2020).

[70] Nicholas Chrastil, *Louisiana Federal Prison No Longer Testing Symptomatic Inmates for Coronavirus due to 'Sustained Transmission*,' The LENS (Mar. 31, 2020), https://bit.ly/2AbNA3P.

[71] Barr, *5,000 Corrections Officers Have Contracted COVID-19.*

[72] *See* AFGE, *A BOP Officer Contracted Coronavirus. He was Told to Return to Work ASAP* (May 4, 2020), https://bit.ly/35KSCjA.

[73] Federal Bureau of Prisons, *BOP: COVID-19 Update* (archived copy, Apr. 14, 2020), https://bit.ly/2LerakY.

[74] BOP COVID-19 Website (last visited May 9, 2020) (number of "confirmed positive" tests is the sum of all cases reported by BOP).

[75] See *United States v. Rumley*, No. 4:08-cr-00005-JLK-JCH, Doc. 185, at 4-7 (W.D. Va. Apr. 3, 2020).

[76] *See United States v. Segal*, No. 1:18-CR-0733, Doc. 48, at 7-8 (N.D. Ill. May 4, 2020).

[77] *See* Apoora Mandavilli, *Infected but Feeling Fine: The Unwitting Coronavirus Spreaders*, N.Y. Times (Mar. 31, 2020), https://nyti.ms/2SKEaTm.

[78] Michael Balsamo, *Over 70% of Tested Inmates in Federal Prisons have COVID-19*, AP News (Apr. 29, 2020), https://bit.ly/2WNrsEy ("70% of tested inmates").

[79] ACLU, *ACLU and Council of Prison Locals Call for Mass Testing of All Employees and Incarcerated People as Over 5,000 Correctional Officers Test Positive for COVID-19* (May 7, 2020), https://bit.ly/35HSz8h.

immediate drastic action" would demonstrate a "lack of regard for the lives of tens of thousands of correctional professionals and millions of incarcerated individuals and their families."[80]

BOP's announcement on May 7, 2020 that it plans to expand testing provides little consolation.[81] While promising expansion, the press release does not explain the scope of the enhancement. Nor does it mention any plan to test staff. BOP practices in its contract-private prisons are similarly opaque. It took weeks for BOP to report COVID-19 cases in privately run prisons: the data was not posted on its website until May 7, 2020.[82] It has yet to report how many individuals incarcerated in private prisons have been tested, or how many staff have been tested or confirmed positive.

Failure to test has long-term implications. Absent robust, universal testing, incarcerated individuals cannot safely access counsel, the courts, and programming.

***Failure to Protect.*** Not only is BOP failing to identify positive cases, it is failing to prevent the spread of disease through basic measures like adequate PPE. In the CARES Act, Congress dedicated $27 billion to purchasing PPE to protect first responders from infection.[83] On April 10, 2020, Director Carvajal told federal prison employees: "[L]et me assure you, we have a sufficient quantity of personal protective equipment."[84] Employees around the country tell a different story.

Staff and inmates are desperate for PPE. After a serious outbreak at Lompoc USP in California, the facility "is still not receiving sufficient [PPE]."[85] Officers and staff are "reportedly sleeping in their cars to avoid the potential transmission of the disease to their loved ones at home."[86]

Even at facilities with facemasks, "officers worry that the PPE they've been given isn't adequate to protect them from daily contact with inmates, especially at facilities where dozens have tested positive."[87] The union representing officers and staff at FCI Tallahassee filed an OSHA complaint because, after "[w]eeks of requests from the . . . labor union, . . . officers were supplied with what

---

[80] *Id.*

[81] Bureau of Prisons, *Bureau of Prisons to Expand Rapid Testing Capabilities* (May 7, 2020), https://bit.ly/2zjLcb1.

[82] Joseph Neff, *Why Did It Take the Feds Weeks to Report COVID-19 Cases in Privately Run Prisons*, The Marshall Project (May 8, 2020), https://bit.ly/2YMuI5F; *see also* Bureau of Prisons, *Privately-Managed Prisons*, https://bit.ly/3bITJau (last visited May 9, 2020).

[83] Rep. Greg Walden, *CARES Act Delivers on our Health Care Needs in a Big Way*, The Hill (Mar. 27, 2020), https://bit.ly/2WDsliV.

[84] Michael Carvajal, *Dir. M.D. Carvajal Addresses All Staff*, 0:45 (Apr. 10, 2020).

[85] Letter from Rep. Carbajal, Sen. Harris, and Sen. Feinstein to Director Carvajal 1 (Apr. 21, 2020), https://bit.ly/2Admo4P ("Feinstein Letter").

[86] *Id.* at 1.

[87] Balsamo, *70% of Tested Inmates.*

they call counterfeit N95 masks" that "lacked the label and design that the [CDC] says a legitimate mask should have."[88]

A separate OSHA complaint filed by CPL says that BOP's failures are "proliferating the spread of" COVID-19 "both within our prison system and to our surrounding communities," and is "expected to result in death and severe health complications and/or possible life-long disabilities."[89] Specifically, the complaint alleges that BOP has failed to provide proper PPE to staff transporting "hospitalized inmates testing positive for the virus" and that BOP has failed to provide sufficient air filtration and other controls to minimize the spread of the virus.[90]

We entreat Congress to take immediate action. Action to protect incarcerated individuals, prison employees, and our communities by requiring DOJ and BOP to implement basic and humane measures to prevent the spread of COVID-19 at all federal detention facilities. Action to prevent prosecutors from needlessly opposing the release of vulnerable individuals who pose no specific threat of violence. And action to allow courts to release responsibly or transfer temporarily at-risk individuals to the safety of the community.

Sincerely,

/s/
David Patton
Executive Director, Federal Defenders of New York
Co-Chair, Federal Defender Legislative Committee

/s/
Jon Sands
Federal Public Defender for the
District of Arizona
Co-Chair, Federal Defender Legislative Committee

/s/
Lisa Freeland
Federal Public Defender for the
Western District of Pennsylvania
Chair, Defender Services Advisory Group

cc:     Hon William G. Barr, Attorney General
        Mr. Michael Carvajal, Director, Federal Bureau of Prisons

---

[88] Call, *Correctional Officers File Complaint.*

[89] National OSHA Compl.; *see* Courtney Buble, *Federal Prisons Pose 'Imminent Danger' in Spreading COVID-19, Union Says,* Government Executive (Apr. 6, 2020), https://bit.ly/2YSMKDD.

[90] National OSHA Compl.

Chairman Lindsay Graham, United States Senate Committee on the Judiciary
Ranking Member Dianne Feinstein, United States Senate Committee on the Judiciary
Sen. Joshua D. Hawley, Chair, Crime Subcommittee
Sen. Sheldon Whitehouse, Ranking Member, Crime Subcommittee

Chairman Jerrold Nadler, United States House Committee on the Judiciary Ranking
Member Jim Jordan, United States House Committee on the Judiciary
Hon. Karen Bass, Chair, Crime Subcommittee
Hon. John Ratcliffe, Ranking Member, Crime Subcommittee

EXHIBIT E

# Inmate's Suit: Legionnaire's Outbreak Evidence of Unsafe Conditions at Coleman

BY STEPHANIE COUEIGNOUX SUMTER COUNTY
PUBLISHED 4:15 PM ET FEB. 14, 2020

**SUMTER COUNTY, Fla.** — An inmate at the federal correctional complex in Sumter County has filed a class-action lawsuit urging all female inmates to be released because she says a Legionnaire's disease outbreak there is causing hazardous conditions.

- **Class-action lawsuit filed in wake of Legionnaire's outbreak at federal prison**
- **Lawsuit filed by inmate says outbreak is indicative of unsafe conditions there**
- **Suit says inmates' constitutional rights have been violated, should be released**
- **RELATED: Legionnaires' Breaks Out at Coleman Federal Women's Prison**

ADVERTISEMENT

Legionnaire's is a lung disease and is typically spread when someone breathes in contaminated water droplets. Federal officials acknowledge some inmates at a satellite camp of Federal Correctional Complex Coleman were diagnosed with Legionnaire's in January.

At the correctional complex camp, a minimum security prison, female inmates are living in what this lawsuit calls "an emergency crisis."

Shelma Wolfenbarger's niece is currently serving time at the camp. She said her niece says there are missing ceiling tiles and mold throughout the facility.

Kara Adams, who filed the class-action lawsuit on behalf of female inmates at the Coleman camp, is an inmate herself. In her lawsuit, Adams says the women's living conditions are "hazardous to the inmates' health," with "sewage backed up into the shower area" and "pipes and air ducts (that are) are exposed, collecting condensation and dripping on people."

The lawsuit also alleges that not every inmate has been tested for Legionnaire's disease or seen by medical staff. Wolfenbarger says her niece asked to be tested but was denied.

Helen Pendland, whose daughter transferred out of Coleman on Tuesday, says her daughter wasn't tested even though she had symptoms.

"She couldn't talk. She had a fever. She could not breathe. She went to medical every time. They called for medical and was not seen," Pendland said.

7q

The lawsuit, filed against U.S. Attorney General William Barr and others, outlines four requests: that the court declare that the inmates' constitutional rights were violated, that all female inmates be released to their homes or families' care, that each inmate receive health insurance for life, and punitive damages.

A spokesman for the Federal Bureau of Prisons declined to directly answer questions about the Legionnaire's outbreak, the suspension of testing, and the camp's living conditions, citing the pending lawsuit.

The spokesman instead sent a written statement: "After we received the first confirmed diagnoses of legionella, corrective measures were put in place... including installation of the recirculating pumps and the point-of-use filters. ... In an abundance of caution... staff will continue to closely monitor and provide treatment, if clinically indicated."

For Wolfenbarger and Pendland, they said they simply want their loved ones, and all inmates, the right to serve their time in a healthy and safe place.

"Yes, they committed a crime. Yes, they deserve to pay their time, but I don't want it to be a life sentence for her," Wolfenbarger said. "I don't want it to cost it her life."

Previous reports said there were 23 Legionnaire's cases at the Coleman camp. But the Bureau of Prisons spokesman said that was based on incorrect data. There were actually two confirmed cases at the camp, he said.

He said both the Bureau of Prisons and the Florida Department of Health are continuing to review the matter.



U.S. Department of Justice
Federal Bureau of Prisons
Federal Correctional Complex-LOW
P.O. Box 1021
Coleman, Florida  33521-1021

January 28, 2020

MEMORANDUM FOR FCC COLEMAN INMATES

FROM:        Kathy P. Lane, Warden

SUBJECT:        Legionella

Recently, some inmates at FCC Coleman-Satellite Camp were
diagnosed with legionella pneumonia.  Legionella pneumonia is a
type of lung infection which is caused by breathing in droplets
of water containing the legionella bacteria.  It is not
generally transmitted person-to-person.

FCC Coleman and the Sumter County Florida Health Department are
working together to investigate the source of this matter.  In
conducting this investigation, the health and safety of staff,
inmates, and the public are the BOP's highest priority.  To that
end, we will be consulting with the Sumter County Florida Health
Department and carefully reviewing any recommendations.

Please see the attached CDC fact sheet regarding legionella
infection.  We will keep each of you updated as we receive any
additional information.

# LEGIONNAIRES' DISEASE

Legionnaires' (LEE-juh-nares) disease is a very serious type of pneumonia (lung infection) caused by bacteria called *Legionella*. If you develop pneumonia symptoms and may have been exposed to *Legionella*, see a doctor right away. Be sure to mention if you have used a hot tub, spent any nights away from home, or stayed in a hospital in the last two weeks.

## Legionnaires' Disease Can Cause Pneumonia Symptoms

Signs and symptoms of Legionnaires' disease can include:

| | | |
|---|---|---|
| Cough | Muscle aches | Fever |
| Shortness of breath | Headache | |

Doctors use chest x-rays or physical exams to check for pneumonia. Your doctor may also order tests on a sample of urine and sputum (phlegm) to see if your lung infection is caused by *Legionella*.

## Legionnaires' Disease Is Serious, but Can Be Treated with Antibiotics

Legionnaires' disease is treated with antibiotics (drugs that kill bacteria in the body). Most people who get sick need care in a hospital but make a full recovery. However, about 1 out of 10 people who get Legionnaires' disease will die from the infection.

## Certain People Are at Increased Risk for Legionnaires' Disease

Most healthy people do not get Legionnaires' disease after being exposed to *Legionella*. Being 50 years or older or having certain risk factors can increase your chances of getting sick. These risk factors include:

- Being a current or former smoker

- Having chronic lung disease, such as emphysema or chronic obstructive pulmonary disease (COPD)

- Having a weakened immune system from diseases like cancer, diabetes, or kidney failure

- Taking medication that weakens your immune system

## *Legionella* Are Usually Spread through Water Droplets in the Air

In nature, *Legionella* live in fresh water and rarely cause illness. In man-made settings, *Legionella* can grow if water is not properly maintained. These man-made water sources become a health problem when small droplets of water that contain the bacteria get into the air and people breathe them in. In rare cases, someone breathes in *Legionella* while they are drinking water and it "goes down the wrong pipe" into the lungs. In general, people do not spread Legionnaires' disease to other people.



Legionnaires' disease, a type of severe pneumonia, is caused by breathing in small droplets of water that contain *Legionella*.

## Commons Sources of Infection

Outbreaks of Legionnaires' disease are often associated with large or complex water systems, like those found in hospitals, hotels, and cruise ships.

The most likely sources of infection include:

 Water used for showering (potable water)

 Cooling towers (parts of large air conditioning systems)

 Decorative fountains

 Hot tubs

CDC



EXHIBIT F

# "RELEASE PLAN"

Upon release my plan of action is to enter the Home of Grace, which is a faith based transitional home for women in Mobile Alabama. There, I will have the opportunity to volunteer my time mentoring women who are just entering the 90 day program portion of the center. I also have the opportunity to resume my career with my previous employer, Quick Delivery Service, as supervisor for the Intermodal, Hot Shot and Air Freight department. In this position I am responsible for overseeing all functions of that department to include dispatch for owner operators and company drivers, payroll for all drivers, customer billing, interaction with domestic and international customers, scheduling and booking for all import/export ocean freight from the Mobile Container Terminal as well as numerous Terminals along the Gulf Coast Region, obtaining oversized/overweight permits for specific freight and keeping drivers in compliance with DOT regulations.

I will seek to find a home church and become actively involved in that community. It is a priority for me to become involved in local outreach/drug abuse treatment programs and share my story and experience, as well as inspire hope and encourage those who are seeking help and support. I will also attend support groups and stay in compliance with probation regulations. I will stay committed to my physical, mental, emotional and spiritual well-being as a whole through continued exercise and staying closely connected to my family and loved ones. I intend to enroll in Dave Ramsey's Financial Peace curriculum and develop a solid program for managing my finances. These are immediate and short term goals.

I have long term goals and aspirations I will continue to work towards as well. First, to start and operate a mentoring program/treatment center for teenage girls and women where they can find hope, faith, recovery and a future. Second, to have a non-profit organization called S.O.W = Salon On Wheels where I will utilize my Cosmetology license and skill sets to visit local treatment centers for women and provide complete makeovers. The intent is to make them feel beautiful on the outside while God is working to restore their beauty on the inside. This will require a lot of planning, development and financial wherewithal but I am committed to giving back and serving those who suffer from addiction and the disparity from it.

In conclusion, I am extremely blessed to have a solid and stable support system of family, friends and loved ones who are committed to providing the necessary guidance, love and support as I transition back into society. It is my heart's desire to serve, inspire others and make my family, friends and society proud of the woman I have become!

Quick Delivery Service:
Adrienne Young - Owner
adrienne@quickdeliveryservice.net
251.709.4040

Quick Delivery Service
Richard Young – Owner
richard@quickdeliveryservice.net
251.454.0975

Home of Grace for Women:
www.homeofgraceforwomen.com
251.456.7807














EXHIBIT G

## IN THE UNITED STATES DISTRICT COURT
## FOR THE
## SOUTHERN DISTRIT OF ALABAMA

ADRIANNE MILLER

      Petitioner,

  vs.                  CASE NO: 1:14-CR-00054-004

UNITED STATES OF AMERICA

      Respondent.

---

**AFFIDAVIT OF ADRIANNE MILLER IN SUPPORT OF MOTION PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i) REQUESTING THE COURT REDUCE THE SENTENCE OF ADRIANNE MILLERFOR EXTRAORDINARY AND COMPELLING REASONS IN LIGHT OF THE FIRST STEP ACT.**

1. I am Adrianne Miller the person in the attached motion seeking compassionate release.

2. I am currently housed at FCC Coleman and have attempted on numerous occasions to file a request to the Warden for compassionate release.

3. I was told that the Warden is not accepting requests and we have no access to the Wardens mail box. No one here will accept my request for the Warden to consider filing a motion for reduction in sentence.

1

4. Currently I am housed with COVID-19 patients in a quarantine unit sleeping on the floor.

5. I am requesting counsel be appointed to assist me moving forward.


Signed Under the Penalty of Perjury

this 27th day of August, 2020.

Adrianne Miller

-------------------------------------------------------------------------------------------

FROM: 15437002 MILLER, ADRIANNE DAVIS
TO: Warden LOW
SUBJECT: ***Request to Staff*** MILLER, ADRIANNE, Reg# 15437002, COL-F-D
DATE: 07/30/2020 01:12 PM

To: Warden Lane
Inmate Work Assignment: Garage / orderly

We do not have a unit team here to accept my paperwork. I am asking that your office file it on my behalf. Thank you
-----Warden LOW on 7/30/2020 11:37 AM wrote:

>
This request must go through your unit team.

>>> ~^!"MILLER, ~^!ADRIANNE DAVIS" <15437002@inmatemessage.com> 7/27/2020 2:10 PM >>>
To: Warden Lane
Inmate Work Assignment: Garage / orderly

I am asking that your office file a motion on my behalf pursuant to 18 USC 3582 for a reduction in sentence. There are extraordinary and compelling reasons in my case that call for a reduction. They are extraordinary and compelling. Those reasons are the danger that I am in with COVID-19 and the fact that I have contracted the virus. My rehabilitation and the extraordinary long sentence that was imposed on me for a non-violent drug offense. All of these reasons militate for a reduction in sentence. If released I will be living with Adrienne and Richard Young at 2455 Snow Road North, Semmes Alabama 36575.

Due to COVID-19, we have no unit team on hand to receive my written request. Our counselors will not be responsible for receiving these type of documents, as I have already tried this route. I consider these extenuating circumstances to have my request filed through electronic email communication.

Thank you
Adrianne Miller
15437-002

**UNITED STATES POSTAL SERVICE.**

Retail

**P** | US POSTAGE PAID
**$0.00**

Origin: 33521
08/28/20
1117550512-09

**PRIORITY MAIL 2-DAY®**

1 Lb 8.30 Oz

1006

EXPECTED DELIVERY DAY: 08/31/20

C005

SHIP TO:
155 SAINT JOSEPH ST
Mobile AL 36602-3914

**USPS TRACKING® NUMBER**



9505 5126 3316 0241 2325 47

• When used internationally, a customs
declaration label may be required.

* Domestic only



FROM:

15437002
Adrianne Miller
Federal Correctional Co...
PO Box 1027
Coleman FL 3352...

TO: US District Cou...
Clerk
Southern Distr...
Alabama
155 St. Joseph ...

To schedule free
Package Pickup,
scan the QR code.



